FILED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

2013 JUN 13 A 10: 14

UNITED STATES OF AMERICA,

Case No. **CA 13 - 442** DISTRICT COURT
DISTRICT OF RHODE ISLAND

Plaintiff,

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

v.

**STATE OF RHODE ISLAND** and
**CITY OF PROVIDENCE,**

Defendants.

The United States of America alleges that Defendants, the State of Rhode Island ("State")

and the City of Providence ("City"), including the Providence Public School Department, have

discriminated against individuals with intellectual and developmental disabilities ("I/DD") by

unnecessarily segregating them or by placing them at risk of segregation in violation of Title II

of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134.

Specifically, Defendants have unnecessarily segregated approximately 90 individuals with I/DD

in a sheltered workshop and segregated day program in North Providence, Rhode Island, and

have placed approximately 85 public school students with I/DD from the Providence Public

School Department at risk of unnecessary segregation in that same adult day activity service

program. In support thereof, the United States pleads as follows:

## INTRODUCTION

1.    In Rhode Island, day activity services for individuals with I/DD include facility-

based day programs, facility-based sheltered workshops, integrated day services, integrated

supported employment, and group employment.

2.    Training Thru Placement, Inc. ("TTP") is a segregated day activity service

program in North Providence that is licensed and funded by the State to provide both sheltered

workshop and day program services to approximately 90 individuals with I/DD in its facility-based program.

3.    The TTP site is located in a dilapidated former elementary school in a residential neighborhood, without easy access to retail businesses, offices, or public spaces. Individuals with I/DD typically remain at TTP for 15-30 years.

4.    Individuals with I/DD at TTP spend their day packaging and labeling medical supplies, wrapping television remote controls in plastic, or hand-sorting jewelry. When not performing work tasks, they engage in TTP's day program activities like playing cards, coloring, and socializing on the facility floor.

5.    TTP service recipients have been paid extremely low wages in violation of the Fair Labor Standards Act ("FLSA"). *See Letter to TTP from the United States Department of Labor ("DOL") (Jan. 14, 2013) (on file with DOL) (detailing DOL's conclusions, based on its targeted investigation, that TTP had violated provisions of the FLSA pertaining to special minimum wage rate certificates ("14(c) certificates"), 29 U.S.C. § 214(c)); Letter to TTP from DOL (June 12, 2013) (on file with DOL) (notifying TTP that all special minimum wage certificates issued by DOL in effect from June 1, 2010 until January 31, 2013 are revoked and that all covered employees performing work subject to the FLSA between June 1, 2010 and January 31, 2013 must be paid no less than the federal minimum wage for all hours worked.). TTP has reported that individuals in its facility make the average hourly wage of $1.57 per hour, with one individual making as little as 14¢ per hour.[1]

6.    Many persons with I/DD who receive services at TTP are capable of, and not

---

[1] TTP service recipients' $1.57 average hourly wage is derived from records submitted by TTP to the DOL Wage and Hour Division, and may not reflect the full wages that were in fact owed, or the wages that were actually paid, to service recipients.

opposed to, receiving supported employment and integrated day services where they would have the opportunity to access individual jobs in typical work settings that pay minimum wage or higher, and to participate in self-directed activities in the community when they are not receiving employment or residential services.

7.     The Harold A. Birch Vocational Program ("Birch") is a self-contained special education program for approximately 85 students with I/DD, ages 14-21, located inside a wing of Mount Pleasant High School in Providence, Rhode Island. Birch operates a segregated sheltered workshop inside the school as part of its daily school program for students with I/DD.

8.     Beginning at age 14, students with I/DD in Birch's sheltered workshop have been required to perform various mundane tasks, including hand-sorting and assembling jewelry and hand-sorting buttons, in exchange for subminimum or no wages. Birch students have also completed contract work for TTP.

9.     Birch, through its sheltered workshop program, has served as a direct pipeline to TTP, channeling students from a children's sheltered workshop to an adult workshop. By requiring students to spend part of the day in a school-based and -operated sheltered workshop as part of the curriculum, Birch has trained students for continued placement in segregated sheltered workshops.

10.     In the Birch sheltered workshop, students complete contracts obtained by the school with private companies. To fulfill these contracts, students perform the same types of repetitive and mundane manual tasks performed at TTP. In the past twenty-six years, only a handful of individuals have transitioned into individual supported employment after leaving Birch. Most Birch students who receive postsecondary employment services enter TTP or another segregated facility-based program after leaving Birch.

11.     Students that participate in the Birch sheltered workshop are paid between 50¢ and $2.00 per hour or are unpaid.

12.     Students at Birch qualify for, and are not opposed to, receiving integrated transition and work-preparation services, such as mentorships, internships, or trial work experiences, to assist their transition to work in integrated employment settings after leaving school.

13.     The State and the City have discriminated against individuals with I/DD who receive services at TTP and Birch by planning, structuring, administering, and funding a day activity service system in a manner that relies heavily and unnecessarily on the segregated sheltered workshop and day program at TTP and that places individuals at Birch, or who have recently exited Birch, at serious risk of placement in TTP.

14.     The State and City have failed to provide persons with I/DD at TTP and Birch with meaningful access to adequate and effective transition, supported employment, and integrated day services that would allow them to work in integrated employment settings and to experience an integrated day.

15.     Because the State and the City have not made available adequate and effective transition, supported employment, and integrated day services for people with I/DD who qualify for and do not oppose such services, such persons are at risk of entering TTP, or are made to enter TTP and remain at TTP, in order to receive employment and day services at all.

16.     Some TTP service recipients have explicitly asked to work in integrated employment settings and/or to receive integrated day services during their annual Individual Support Plan ("ISP") meetings. For example, one person who has worked at TTP for approximately 30 years said that he asked the provider nearly every year that he has been at TTP

4

to work in a hardware store, yet he has never been assessed or received services or supports necessary for him to work in an integrated setting, let alone a hardware store. When asked how he would feel about working in integrated employment, this consumer stated, "I'd feel I accomplished something . . . something to be happy about." Such individuals were qualified for those services, yet no serious attempts were made to assist them in transitioning to integrated employment settings.

17.     Similarly, many Birch students have articulated their desire to work in integrated employment settings and/or to receive integrated day services following their exit from school. For example, one student stated his interest in "work[ing] at Kmart" following exit from Birch. However, he received no transition-related services to assist him in achieving this goal. Instead, among other things, he was referred to a website to learn more about employment, was recommended to participate in community outings to "develop his money management skills," and advised to "practice good personal hygiene." This student entered TTP after he exited Birch and presently receives services at TTP. Although many Birch students were qualified for integrated services, such services were not provided and, instead, individuals were acculturated and trained to perform sheltered workshop tasks while at Birch, were not informed of integrated alternatives, and some were placed at TTP following their exit from school.

18.     Rhode Island provides supported employment and integrated day services to a limited number of persons with I/DD. For many of these individuals, supported employment services have allowed them to work in competitive wage jobs in integrated employment settings where they can access benefits, opportunities for advancement, and a measure of economic self-sufficiency. Many of these same persons receive the integrated day services necessary to participate in activities of their choosing during times when they are not working or receiving

residential services.

19.     Such persons, however, are far outnumbered by the number of people at TTP and Birch who have been or will be unable to access supported employment and integrated day services because the State and City have over-relied on the segregated transition, sheltered workshop and day services at TTP and Birch to the exclusion of integrated alternatives.

20.     The unnecessary segregation of people with I/DD in sheltered workshops and segregated day programs contravenes one of the primary purposes of the ADA: to end the isolation and segregation of individuals with disabilities. As Congress stated in the findings and purpose section of the ADA: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

## PARTIES

21.     Plaintiff is the United States of America.

22.     Defendants are the State of Rhode Island and the City of Providence, both of which are public entities within the meaning of the ADA, 42 U.S.C. § 12131(1), and therefore subject to Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. pt. 35.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C. §§ 12131-12134, and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201(a) and 2202.

24.     Venue is proper in the District of Rhode Island under 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to this action occurred in Rhode Island.  28 U.S.C. § 1391(b).

## STATUTORY AND REGULATORY BACKGROUND

**A.     The Americans with Disabilities Act and *Olmstead v. L.C.*, 527 U.S. 581 (1999)**

25.     The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

26.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1).  Among the specific issues the ADA addresses are "segregation" and actions that prevent persons with disabilities from "fully participat[ing] in all aspects of society[.]" *Id.* §§ 12101(a)(1), (5).

27.     In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" *Id.* § 12101(a)(2).  Congress also found that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]" *Id.* §§ 12101(a)(6)-(7).

28.     The ADA was also intended to enable individuals with disabilities to gain economic independence and to "move proudly into the economic mainstream of American life." President George H.W. Bush, Remarks at the Signing of the Americans with Disabilities Act (July 26, 1990), *available at*

http://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html.

29.     Title II of the ADA prohibits discrimination on the basis of disability by public entities.  42 U.S.C. § 12132.  A "public entity" is any state or local government and any department, agency, or other instrumentality of a State or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements.  *See* 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R. § 35.130.  Accordingly, Title II's coverage extends to the State, the City, and their respective agencies, departments, and programs.

30.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA.  42 U.S.C. § 12134(a).

31.     The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The Rehabilitation Act contains a similar requirement.  *Id.* § 41.51(d).  "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."  *See id.* § 35 app. B.

32.     Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation, or "that have the purpose or

8

effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" *Id.* § 35.130(b)(3).

33.    The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999).

34.    The Supreme Court's holding in *Olmstead* "reflects two evident judgments." *Id.* at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

35.    Under *Olmstead*, public entities are required to provide community-based services, rather than segregated services, when such services (a) are appropriate, (b) are not opposed by the affected persons, and (c) can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

**B.    Application of the ADA and *Olmstead* to Day Activity Services**

36.    The ADA's integration mandate applies to all the programs, services and activities of a public entity, including its day activity services. 28 C.F.R. §35.130(d) ("A public entity shall administer *services, programs, and activities* in the most integrated setting . . . .") (emphasis added); *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1205-06 (D. Or. 2012) (finding that the "broad language and remedial purposes of the ADA" support the conclusion that the integration mandate applies to employment services and declining to find that the application of the Supreme Court's holding in *Olmstead* was limited to residential settings).

37.     Thus, under the ADA, states and localities may not administer policies that steer individuals with I/DD into facility-based sheltered workshop and/or segregated day programs and away from available, appropriate integrated alternatives like supported employment and day services in the community if the individuals in question qualify for and do not oppose the latter.

38.     The unnecessary segregation of people with I/DD in sheltered workshops and facility-based day programs contravenes one of the primary purposes of the ADA: to end the isolation and segregation of individuals with disabilities.

## FACTUAL ALLEGATIONS

**A.    Defendants' Systems for Providing Vocational Rehabilitation, Day Activity, and Transition Services to Persons with I/DD**

39.     The State manages its training, vocational, Medicaid, employment, and day services for persons with I/DD, through its Executive Office of Health & Human Services ("EOHHS"). EOHHS coordinates several State agencies in their delivery of services to adult individuals with I/DD, including: (a) the Department of Human Services, in which the Office of Rehabilitation Services ("ORS") is a sub-agency; and (c) the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ("BHDDH"), including its Division of Developmental Disabilities. These agencies determine the amount and allocation of funding for these services, including the range of employment and day services, the licensing of employment and day service providers, and the level of funding for sheltered workshops and facility-based day programs versus integrated supported employment and integrated day programs.

40.     ORS provides services to individuals with disabilities, including individuals with I/DD, through its Vocational Rehabilitation Program. The services provided through this program focus on initial job readiness and placement. *See* 39-1-112 R.I. Code R. § 101.2(II)(B).

41.     The vocational rehabilitation services provided by ORS pursuant to an Individual Plan for Employment ("IPE") are time-limited to a maximum of eighteen months. *See id.* § 115.14(III)(B)(1); see also 34 C.F.R. §§ 363.6(c)(2)(iii)–(iv).

42.     The types of services that the BHDDH-licensed service providers may provide to individuals with I/DD who are their customers include (i) residential support services, 46-1-14 R.I. Code R. §§ 39.0-42.0; and (ii) non-residential supports, which are called "day activity services," *id.* §§ 43.0-45.0.

43.     "Day activity services" may include (i) "[d]ay program service," (ii) "[p]revocational training," (iii) "[s]upported employment," or (iv) "[j]ob development." *Id.* § 43.01. Day program services can be offered either on-site at a facility, or in a community setting. *See id.* §§ 44.01; *see also id.* §§ 1.14 (defining "Center-Based Day Program Service"), 1.17 (defining "Community-Based Day Program Service").

44.     A facility-based day program is a segregated facility where individuals with I/DD participate in non-work daytime activities. Facility-based day programs are usually located in large institutional facilities in which persons with I/DD have little or no contact with non-disabled persons besides paid staff.

45.     By contrast, integrated day services (*e.g.*, day program services provided in a community setting) are services that allow persons with I/DD to engage in self-directed activities in the community and to interact to the fullest extent possible with non-disabled peers.

46.     A sheltered workshop is a segregated facility that exclusively or primarily employs persons with disabilities. Sheltered workshops are usually large, institutional facilities in which persons with disabilities have little to no contact with non-disabled persons besides paid

11

staff.  In sheltered workshops, persons with disabilities typically earn wages that are well below minimum wage.

47.     By contrast, supported employment services typically include the services necessary to place, maintain, and provide ongoing support to an individual with I/DD in an integrated employment setting in the community.  "Supported employment services" are defined in BHDDH's regulations as "activities needed to help . . . develop the specific job skills necessary to sustain paid employment earning at least 50% of the state minimum wage and working in an integrated environment." *See id.* § 1.95; *see also* 46-1-13 R.I. Code R. § 37.4.

48.     In addition to delivering services to adult individuals with I/DD, the State, through the Rhode Island Department of Education ("RIDE"), BHDDH, and ORS, and the City, through the Providence Public School Department, administer, oversee, and provide transition services for students with I/DD in secondary schools to prepare students to leave school and enter postsecondary employment or education. Transition services are "a coordinated set of activities for a young person with a disability, designed within an outcome oriented process, that promotes movement from school to post-school activities including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation." R.I. Gen. Laws § 16-24-18(e)(1).

49.     Rhode Island law requires local school districts to conduct individualized planning for children with I/DD regarding their postsecondary goals; and this process of transition planning must begin by age fourteen, or younger if determined appropriate in the individualized education program. R.I. Gen. Laws § 16-24-18(d).  Pursuant to Rhode Island law, ORS vocational rehabilitation counselors and BHDDH representatives should participate in the

individualized transition planning process if they provide or will provide services to the young

person with a disability in their individual plan. *Id.*

50.     In March 2013, BHDDH adopted an Employment First policy, which states:

[E]mployment opportunities in fully integrated work settings shall be the first and priority option explored in the service planning for working age adults with developmental disabilities in Rhode Island. While all options are important and valued, integrated employment is more valued than non-employment, segregated employment, facility-based employment, or day habilitation in terms of employment outcomes for individuals with developmental disabilities.

Department of Behavioral Health, Developmental Disabilities and Hospitals, "Rhode Island

Employment First Policy: A Time for Action" (Feb. 2013), *available at*

www.riddc.org/downloads/BHDDHEmploymentFirstPolicy21213.doc.  The Rhode Island

Employment First Policy and Five Year Implementation Plan, adopted in February 2013, states:

It is expected that through implementation of this policy, individuals will be engaged primarily in paid employment. However, it is recognized that for individuals who are working on a part time basis, employment may not fully occupy their weekday hours. For these individuals, it is expected that the priority for activities during non-working daytime hours should be on supporting individuals in other typical adult activities in the community, including volunteer work, recreation, and daily living activities.

Department of Behavioral Health, Developmental Disabilities and Hospitals,

"Employment First Rhode Island State Policy and Five Year Implementation Plan" (Feb.

2013) (on file with BHDDH).

51.     Nevertheless, the State, and BHDDH, only recently issued this Employment First

Policy, and prior to this policy's issuance there was no state level policy that prioritized

integrated employment or day services for persons with I/DD as service planning options in

Rhode Island.

52.     The City, including the Providence Public School Department, does not have an

Employment First Policy.

13

**B.**     **The State Unnecessarily Segregates Individuals with I/DD at the Provider TTP**

53.     TTP is a non-profit corporation organized under the laws of Rhode Island. It is licensed by BHDDH to provide both sheltered workshop and day program services to persons with I/DD.

54.     Approximately 90 persons with I/DD currently receive employment and day services at TTP. TTP bills its services to BHDDH under the sub-category of "day program services."

55.     TTP serves approximately 40% of all individuals with I/DD who Rhode Island has reported to CMS receive prevocational services in facility-based settings, making TTP one of the largest facility-based employment providers in the State.

56.     TTP is a segregated setting with many of the hallmarks of other segregated settings: the physical layout is institutional in nature, individuals work in fixed, highly regimented schedules and routines, individuals exercise very limited choice over the activities that they engage in throughout the day, the duration of individuals' placements in the facility are for significantly long periods of time, and importantly, at TTP, individuals with disabilities are not able to interact with individuals without disabilities to the fullest extent possible.

57.     TTP provides virtually all of its services on-site at its facility at 20 Marblehead Avenue, North Providence, Rhode Island. This facility is a former elementary school building, which TTP has owned for many years. As of January 2013, the building was in disrepair and considerable public health and occupational safety issues have been documented by the State and its agents with regard to TTP's facility and program.

58.     The TTP facility is located in a residential neighborhood. Its location is neither pedestrian friendly nor easily accessible by public transit. The TTP facility is in the proximity of

14

few businesses or public spaces in which interaction with non-disabled individuals would be likely to occur.

59. The physical layout of TTP's facility is institutional in nature, in that the space designated for TTP service recipients with I/DD is largely separated from the space designated for TTP's management and staff.

60. Most of the service recipients' time at TTP is spent engaged in rote manual tasks such as assembling, sorting, packaging, and labeling jewelry supplies and medical supplies on inflexible schedules. Such tasks are frequently not matched by the provider to individuals' abilities and strengths.

61. Two TTP service recipients are assigned to the basement of the facility on the "Pandora's Products" product line, which involves more demanding tasks. There, they use various kitchen utensils to repetitively stuff peppers with ham and seasonings and to grate and package Romano cheese. They place the food products in jars and label the jars, which TTP then sells via a wholesale catalog business.

62. A handful of non-disabled staff supervises the workshop floor by monitoring individuals' production. TTP service recipients have little or no contact with non-disabled persons other than paid staff.

63. All TTP service recipients are paid below minimum wage. The provider reported that one person earned as little as 14¢ per hour, and that individuals at TTP make the average hourly wage of $1.57 per hour.[2]

64. When individuals with I/DD take breaks from performing workshop tasks at TTP (for example, when work is slow or unavailable) they generally cannot leave the facility grounds.

---

[2] *See supra*, note 1.

Instead, service recipients participate in the provider's day program known as the "continued socialization program," which functions as a set of supervised activities designed to keep service recipients occupied at times during the day when they are not working. As part of the continued socialization program, individuals with I/DD typically sit at their workstations playing cards, coloring, or talking.

65.     Consistent with its operation of both a sheltered workshop and the continued socialization program, TTP is licensed by BHDDH to provide, and it bills for, both day and employment services interchangeably.  TTP's continued socialization program is also segregated.

66.     As part of its continued socialization program, TTP occasionally holds scheduled, supervised recreational activities.  As with TTP's workshop activities, these recreational activities are generally attended only by TTP service recipients and staff and provide individuals with I/DD practically no opportunity to socialize with non-disabled peers.  Individuals who participate in these activities remain under the strict supervision of paid staff at all times.

67.     TTP service recipients often remain at TTP for decades: (a) service recipients typically remain at TTP for 15-30 years; (b) within the last three years, only eight people have left TTP to access services elsewhere in the State's service system for individuals with I/DD; and (c) as of January 2013, only one or two individuals were known by the provider to have transitioned from TTP into work in integrated settings in recent memory.

68.     TTP service recipients have had practically no contact with vocational rehabilitation counselors and, as of January 2013, TTP had no established relationship with ORS. Consequently, TTP services recipients have not received the services and supports necessary for initial placement in supported employment.

69.     Most, if not all, of TTP service recipients are capable of participating in and benefitting from individual supported employment and integrated day services in the community.

**C.      The State and the City Place Birch Students with I/DD at Serious Risk of Unnecessary Segregation in Sheltered Workshops**

70.     Approximately half (47%) of all individuals served by TTP over the past three years entered TTP directly from Rhode Island public schools, and more than two-thirds (70%) of that subset of service recipients entered TTP from Birch. Of the individuals served by TTP over the past three years, approximately one-third (32%) transitioned to TTP from Birch.

71.     Birch is a special education program located in a self-contained wing on the first floor of Mount Pleasant High School, and it has been designated exclusively for students with significant disabilities. "Almost all of the [Providence public school] district's students identified as having an intellectual disability at the secondary level attend Birch Vocational Center[.]" Improving Special Education Services in the Providence Public School District: Report of the Strategic Support Team of the Council of the Great City Schools, 84 (Summer 2011), *available at* http://www.cgcs.org/cms/lib/DC00001581/Centricity/Domain/4/Providence%20Special%20Education%20Report.pdf. Both Birch and Mount Pleasant are administered by the City, including the Providence Public School Department.

72.     Approximately 85 students with I/DD, ages 14-21, currently attend Birch, where the most prevalent diagnoses are autism and Down Syndrome.

73.     Birch reserves one large classroom with several long cafeteria-style tables for use as a licensed sheltered workshop, and most students circulate through the sheltered workshop at some point during each school day as part of the school curriculum.

74.     Birch obtains contracts from private businesses for students to perform workshop tasks in its school-based workshop such as bagging, labeling, collating, and assembling jewelry to meet production deadlines. Birch students are supervised in the completion of tasks by school special education staff who monitor their production and ensure that the requirements of each contract are being met.

75.     Most Birch students are paid substantially below the minimum wage for the completion of tasks in the sheltered workshop program. Records reflect that students at Birch who earned wages were typically paid between 50¢ and $2.00 per hour, no matter what job function they performed or how productive they were in the performance of that function.

76.     The remainder of the students are given tasks similar to their paid peers but paid no wages at all. For example, such students have been instructed to place buttons in plastic bags, a task of similar quality to the tasks assigned to their peers, only to have their work dumped back into a pile at the end of the period or day, while their peers' work is used to meet contract requirements. However, these unpaid students are capable of participating in and benefitting from individual transition and supported employment services, and they demonstrate very few differences in ability from the students who are paid subminimum wages.

77.     Students who are 14-15 years of age generally spend 55 minutes or more in the Birch sheltered workshop per day, while students who are 16 years of age generally spend 110 minutes or more in the sheltered workshop per day. There are approximately 24 to 27 students in the workshop at any given point of the day, as students cycle through the sheltered workshop during designated periods of the day. There are six 55-minute classroom periods per day. Therefore, students who cycle through the sheltered workshop for two periods in a day, or 110 minutes, spend up to one-third of their classroom instruction time in the sheltered workshop.

78.     The tasks that Birch's students perform in the school's sheltered workshop program are similar to tasks performed by TTP's adult service recipients. Indeed, in the past, TTP subcontracted some of its contract work to Birch for students to complete.

79.     Birch students generally do not experience integrated transition work placements and are not provided with the transition services necessary to achieve their post-secondary employment goals.

80.     On the contrary, most Birch students are given transition work placements only on school premises. For example, in addition to participation in the in-school sheltered workshop, some Birch students are given the job of assisting cafeteria staff with emptying the Mount Pleasant High School trash.

81.     Most, if not all, of Birch's students with I/DD are capable of participating in and benefitting from integrated transition work placements and related services while in school, or work in integrated employment settings after they exit Birch.  In fact, some Birch students have already demonstrated that they qualify for, and are not opposed to, working in integrated employment settings. For example, a handful of Birch students were previously engaged in integrated work placements at a hospital, but were discouraged from continuing their involvement in their work placements there by school staff.

82.     Birch students typically do not exit school until they are 21 years of age. When Birch students reach 21 years of age and leave the school, they receive "certificates of attendance" instead of high school diplomas.

83.     If Birch students seek post-secondary employment services, they are often directly referred by school staff and/or BHDDH representatives to TTP or another sheltered workshop provider in North Providence. BHDDH social workers have accompanied students

from Birch on tours of TTP to become acquainted with TTP's services; and they have done so to the exclusion of touring or introducing students to integrated alternatives. Birch students are rarely introduced or referred to integrated employment or other integrated day service options prior to making referrals to TTP, and in the past twenty-six years only a handful of individuals have transitioned into individual supported employment after leaving Birch.

84.    Birch students have had practically no contact with ORS. Consequently, Birch students have failed to be enrolled in ORS services prior to exit from Birch and no vocational rehabilitation counselor is or has been present at Birch students' IEP or ISP meetings. As a result, Birch students have been unnecessarily and unjustifiably excluded from accessing supported employment services through ORS, including 18 months of initial placement services.

85.    The extent of the transition-related information or services available and accessible to Birch students and parents about post-secondary integrated employment and day services is: (1) a list of the approximately 38 BHDDH-licensed service providers, the vast majority of which are segregated facility-based programs, on which TTP is listed as one of two available providers located in North Providence; and (2) a letter from the Birch principal that is sent home with students approximately one to two months prior to their exit from Birch informing families of the telephone number for BHDDH to seek more information about possible postsecondary employment and other services.

86.    The City, including Providence Public School Department, has long been aware that Birch places students at risk of postsecondary segregation in sheltered workshops, and fails to offer transition services designed to enable students to access integrated transition work placements and integrated employment-related services and supports.  A 2011 report to the City's department of public schools stated:

> Concerns about [Birch's] provision of instruction and transitional activities and services for students . . . include (1) access to the curriculum "at a very low level," (2) no expectation that students graduate with a regular diploma, (3) the fact that only one student takes public transportation to school, (4) access only to a sheltered workshop experience, (5) an attitude that immunizations required for hospital and medical center worksites would be harmful to students, and (6) limited interaction with the community. There appears to be no real desire to change the situation.

Improving Special Education Services in the Providence Public School District: Report of the

Strategic Support Team of the Council of the Great City Schools, 84 (Summer 2011), *available*

*at*

http://www.cgcs.org/cms/lib/DC00001581/Centricity/Domain/4/Providence%20Special%20Edu

cation%20Report.pdf.

**D.    Defendants' Actions and Failures to Act Have Caused TTP Service Recipients to Be Unnecessarily Segregated and Birch's Students to Be Placed at Risk of Segregation.**

87.    Defendants' actions and failures to act have resulted in the unnecessary placement

of persons with I/DD at TTP and have given individuals served at TTP little genuine opportunity

to make the informed choice to receive supported employment and integrated day services in the

community. Likewise, Defendants are responsible for placing Birch's students at risk of future

segregation.

88.    The State, through BHDDH, failed to ensure that TTP service recipients were

engaged in a meaningful ISP process that documented their employment goals. For instance,

ISPs completed by TTP were not conducted consistently or annually; they were rarely completed

in the presence of legal guardians, family members, or BHDDH social workers; they were

conducted without access to necessary translation services; and they routinely included recycled

and boilerplate language regarding service recipients' employment goals and interests.

89.     Although nearly 40% of TTP's service recipients stated in their ISPs that they wanted outside employment, a real job in the community, to earn more money, or participate in activities in the community, few if any were offered vocational evaluations or situational assessments, or were introduced to information about, or opportunities to experience, integrated supported employment or other day activity services.

90.     While the State does provide some integrated supported employment and integrated day services, overall it has not provided a sufficient quantity or supply and has over-relied on the segregated provider TTP.

91.     The State has failed to provide vocational rehabilitation services to individuals with I/DD at TTP.

92.     The State and the City failed to introduce students with I/DD at Birch to information that would have allowed them to make informed choices about post-secondary integrated employment or day services.

A.     The State and City, through operation and administration of the Birch sheltered workshop, prepared, acculturated, and trained Birch students for lives in sheltered workshops by requiring many students to spend parts of each school day in Birch's own in-house sheltered workshop.

B.     The State and the City failed to provide transition planning or vocational services to Birch students with I/DD, in direct contravention of Rhode Island statutory requirements to provide transition services to students with disabilities to assist, *inter alia*, their transition to postsecondary integrated employment settings. R.I. Gen. Laws § 16-24-18.

i.     Only 2 of 120 Birch students over the past four academic years received transition-related assessments that were employment-related, like situational or

community-based vocational assessments. Most assessments that were conducted were premised upon teacher-observations at Birch or paper/web-site based assessments, and very few were actually employment-related.

        ii.    Many students at Birch were explicitly and exclusively prepared for sheltered workshop placements after graduation, while other integrated employment alternatives were unexplored.

        C.    While at Birch, many students received no transition-related services specific to assisting them to work in integrated settings, in spite of some students' specifically enumerated postsecondary goals of competitive employment.

        D.    Students at Birch (a) were rarely, if ever, referred to supported employment providers while they were preparing to leave school; (b) were rarely, if ever, taken on site visits to observe integrated supported employment or day services or gain trial work experiences in supported employment, prior to being referred to TTP; and (c) were directly referred to TTP without first having been presented with integrated alternatives.

        E.    The State failed to provide vocational rehabilitation services to these individuals when they were preparing to leave Birch.

    93.    The City and the State are also continuing to place all of Birch's current students at risk of future segregation in sheltered workshop and facility-based day program settings such as TTP, to the exclusion of integrated alternatives, by failing to provide Birch students with the services and supports necessary to make the informed choice to work in an integrated employment setting or to receive integrated day services.

**E.**   **Individuals with I/DD at TTP and Students with I/DD at Birch Are Qualified for and Are Not Opposed to Receiving Services in More Integrated Settings.**

94.    Individuals with I/DD receiving services at TTP and Birch have similar diagnoses and support needs as individuals who successfully work in integrated employment settings or otherwise engage in integrated day activities, with the types of services and supports that currently exist in Rhode Island's transition-related educational and day activity service systems.

95.    Numerous TTP service recipients, including former Birch students who now receive services at TTP, have expressed their desire to receive the necessary supported employment services or integrated day services that would allow them to work or otherwise participate in integrated settings.

96.    Likewise, records from the past four years reflect that the majority of Birch students (79 of 120, or 65.8%) expressed a desire for competitive employment and/or stated the goal of working in integrated settings. For instance, Birch students expressed a desire to work in a daycare, a supermarket, a hardware store, a movie theater, a hospital, as a florist, with animals, and with computers; yet there is little evidence that any services or supports were offered for these students to be able to realize their stated goals.

97.    Many Birch students and TTP service recipients have worked in integrated employment settings and/or participated in integrated day services in the past, and are not opposed to receiving those services in the future.

**F.**   **With Reasonable Modifications to Their Existing Services, Defendants Can Ensure That TTP Service Recipients and Birch's Students Are Able to Access Services in Integrated Settings and Are Not Placed at Risk of Future Segregation.**

98.    The State can, through reasonable modifications to its vocational rehabilitation and day activity service systems, provide individuals with I/DD receiving services from TTP with opportunities to receive employment and day services in integrated settings, and thereby be

24

able to work in competitive employment in the community or otherwise engage in self-directed activities in the community during hours when not working or receiving residential services.

99.     The State and City can, through reasonable modifications to their transition, vocational rehabilitation, and day activity service systems, ensure that Birch students with I/DD are no longer placed at risk of segregation, including at TTP, and are instead provided with transitional services and supports that allow individuals to learn about and experience integrated employment and day services in order to make an informed choice to receive such services in integrated employment and day settings once they exit secondary school.

100.    The types of services and supports needed to provide TTP service recipients with integrated supported employment and day services already exist in the State's vocational rehabilitation and day activity service systems and are currently provided to some individuals with I/DD in the State.  These services include but are not limited to: discovery, vocational assessment, job coaching, job training, job oversight and supervision, and transportation.

101.    The types of services that could be provided to Birch students to prevent the risk of segregation already exist in Defendants' transition, vocational rehabilitation, and day activity service systems.  Moreover, such services are already provided to some students with I/DD in the State, including in Providence.

102.    The actions needed to remedy Defendants' transition, vocational rehabilitation, and day activity service systems to ensure compliance with the ADA could be achieved through the redirection, reallocation, expansion, and coordination of existing resources.

G.    **The United States' Investigation**

103.    On February 14, 2013, and March 20, 2013, the Department presented its findings to counsel for the State and State officials during in-person meetings regarding TTP and Birch.

On April 9, 2013, the Department participated in a conference call with the City, along with counsel for the State, and presented its findings with respect to Birch. The Department provided the State and City notice of their failures to comply with the ADA, and outlined the steps necessary for the State and City to meet their obligations under the ADA. The Department also communicated that, in the event that resolution could not be reached by voluntary means, the Department may initiate a lawsuit.

104.     On June 7, 2013, the Department provided the State and City with official notice of its findings and the minimum remedial measures necessary for the State and City to address identified ADA violations, memorializing the Department's previously communicated extensive oral findings.

105.     Over the course of several months, the Department met with State and City officials and exchanged written proposals in an attempt to reach a resolution to the deficiencies identified in the Department's oral and written findings. The parties ultimately reached agreement.

106.     All conditions precedent to the filing of this Complaint have occurred or been performed.

### VIOLATION OF TITLE II OF AMERICANS WITH DISABILITIES ACT
**(42 U.S.C. § 12131 *et seq.*)**

107.     Paragraphs 1 through 106 of this Complaint are hereby re-alleged and incorporated by reference.

108.     Defendants State of Rhode Island and City of Providence are both public entities subject to Title II of the ADA, 42 U.S.C. § 12131(1).

109.     The following persons have a disability covered by Title II of the ADA, 42 U.S.C. §§ 12102, 12131(2), and qualify for receiving or participating in vocational rehabilitation, day

activity, and/or transition-related educational services, programs, or activities provided by Defendants: (a) individuals with I/DD who receive services at TTP; and (b) students with I/DD currently or recently enrolled at Birch.

110.    The State has violated and continues to violate the ADA by (a) administering and delivering its vocational rehabilitation, day activity, and transition services in a manner that has unnecessarily caused TTP service recipients to be denied the opportunity to receive the benefits of Defendants' services in the most integrated setting appropriate to their needs, and has unnecessarily caused Birch's students to be placed at risk of segregation at TTP; and (b) failing to reasonably modify its administration and delivery of these services in a manner that would avoid discrimination against, and unnecessary segregation or risk of segregation to, these individuals with disabilities.

111.    The City has violated and continues to violate the ADA by (a) administering, planning, funding, and structuring Birch in a manner that has unnecessarily caused TTP service recipients who attended Birch to be denied the opportunity to receive the benefits of Defendants' services in the most integrated setting appropriate to their needs, and has unjustifiably placed current Birch students at risk of segregation at TTP or another segregated provider; and (b) failing to reasonably modify its administration, planning, funding, and structuring of Birch in a manner that would avoid discrimination against, and unnecessary segregation or risk of segregation to, these individuals with disabilities.

112.    Defendants' actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. pt. 35.

113.    Providing services in integrated settings to persons with I/DD at TTP and ensuring that students with I/DD at Birch are not placed at risk of segregation at TTP can be reasonably accommodated.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.    Grant judgment in favor of the United States and declare that Defendants have violated Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, by failing to make reasonable modifications to services, programs, or activities for persons with I/DD that would have enabled service recipients of Training Thru Placement, Inc. to obtain services, programs, and activities in the most integrated setting appropriate to their needs and ensured that students of the Harold A. Birch Vocational Program were not placed at risk of segregation at TTP or another segregated provider;

B.    Enjoin Defendant State of Rhode Island to:

1.    Cease discriminating against employees with I/DD at Training Thru Placement, Inc. and students with I/DD at the Harold A. Birch Vocational Program;

2.    Provide each and every person with I/DD employed at Training Thru Placement, Inc. with vocational rehabilitation, integrated supported employment and integrated day services programs, or activities, which are consistent with his or her individual needs and which are designed to allow him or her to secure, maintain, and succeed in integrated employment settings and otherwise engage in self-directed activities in the community at times and frequencies and with persons of their own choosing at times when not receiving employment or residential services;

3.    Ensure that each and every student with I/DD in the Harold A. Birch Vocational Program is provided with vocational rehabilitation, day activity services, including integrated supported employment and integrated day service programs, and transition-related educational services, programs, or activities, which are consistent with his or her individual needs and which are designed to allow him or her to secure, maintain, and succeed in integrated employment and day settings following his or her departure from school.

C.    Enjoin Defendant City of Providence to:

1.    Cease discriminating against students with I/DD enrolled at the Harold A. Birch Vocational Program;

2.    Ensure that each and every student with I/DD in the Harold A. Birch Vocational Program is provided with vocational rehabilitation and educational services, programs, or activities, which are consistent with his or her individual needs and which are designed to allow him or her to secure, maintain, and succeed in integrated employment settings and other integrated day settings following his or her departure from school.

D.    Order such other appropriate relief as the interests of justice may require.

Dated:  June 13, 2013

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General

PETER F. NERONHA
United States Attorney
District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Phone: (401) 709-5000
Fax: (401) 709-5001

EVE L. HILL
Senior Counselor to the Assistant Attorney General

ALISON BARKOFF
Special Counsel for *Olmstead* Enforcement
Civil Rights Division

REBECCA B. BOND
Section Chief
SHEILA M. FORAN
Special Legal Counsel
ANNE RAISH
Deputy Chief

REGINA KLINE (Md. Atty. #0812170152)
H. JUSTIN PARK
Trial Attorneys
Disability Rights Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW - NYA
Washington, DC 20530
Phone: (202) 307-0663
Fax: (202) 305-9775
regina.kline@usdoj.gov

*Counsel for Plaintiff United States of America*