# UNITED STATES DISTRICT COURT DISTRICT OF RHODE ISLAND

**UNITED STATES OF AMERICA**
    Plaintiff

    v.                                  C.A. No. 13-442L

**STATE OF RHODE ISLAND and**
CITY OF PROVIDENCE
    Defendants

---

## COURT MONITOR'S SECOND REVIEW OF STATE ACTIVITIES IN RESPONSE TO THE ORDER OF COMPLIANCE WITH OUTSTANDING INTERIM SETTLEMENT AGREEMENT REQUIREMENTS FILED JUNE 23, 2017

This is the second report documenting the State of Rhode Island's progress on meeting the performance requirements specified by the Court's Order issued on June 23, 2017 addressing the State's obligations under the Interim Settlement Agreement (ISA). The first part of this assessment covers the State's activities relative to each of the nine provisions of the Order identified in Section I, Action Dates as well as progress related to requirements identified in Section II Placement Status, Section III Job Placements, and Section IV Compliance Dates.

The Court Monitor, in collaboration with Dr. Bill Ashe an independent consultant, conducted a site visit to Community Work Services (CWS) on October 4-6, 2017. The purpose of the visit was to perform an in-depth review of the services furnished to a sample of ten (10) TTP/Birch Target Population members by that agency. Key findings of this review are summarized in Section V and in the complete site visit report included as Attachment I.

The findings and conclusions of this second report are based on documentation provided by the State during September and October 2017 as well as through the CWS site visit. Additional information was gathered during conference calls involving the Parties, direct conversations with key DDD staff and email correspondence with State officials regarding progress on meeting each of the provisions of this Order. Further assessment of the State's progress on

meeting the terms of this Order will take place in accordance with the provisions, requirements and time frames outlined in Section III, Job Placements and in Section IV, Compliance Dates.

## Section I. Action Dates

1. **DDD will implement the variance and retirement policy by June 30, 2017 to specifically discern those who do not identify with either current or long-term employment goals. ORS will assist DDD with ORS-related service implementation.**

   **Status**: DDD developed and posted Variance Policies and Application Procedures and the Retirement Policy on its website by June 30, 2017 as required and is providing training to providers and families. Although case notes in the files of some CWS participants indicate that they are not interested in working in integrated employment, no applications for variances have been received by the Monitor to date.

   <u>**Assessment: Requirements Met**</u>

2. **DDD will ensure quality Career Development Plans (CDP) / Person-centered Planning (PCP) for all active members through a comprehensive review of each plan no later than July 30, 2017.  This review will include confirmation that goals and services align with current employment interest. ORS will assist DDD with any ORS-related service implementation for CDPs/PCPs.**

   **Status:** The State completed a comprehensive review of career development plans and person-centered planning for all TTP Target Population members by July 30, 2017 as required by the Court's Order issued on June 23, 2017 (See Court Monitor's Review Filed September 7, 2017). This review revealed that 52 of 89 CDPs for TTP Target Population members were determined to be unacceptable: 44 individuals served by CWS and 8 served by other provider organizations (Perspectives – 3, Fogarty – 3, Re-Focus – 1, and ABE – 1). The results are summarized in the Court Monitor's September report, reproduced below as Table 1. DDD examined the ISP/CDP documents for TTP Target Population members who are not served by CWS, as was requested in the Monitor's September progress report, and the findings are summarized in Attachment II. In summary, none of the plans for the 8

individuals were determined to be acceptable, four were rated as partially acceptable and the remaining 6 as unacceptable. DDD is working with the provider agencies to address the ISP/CDPs for the 8 individuals.

The Monitor and independent consultant performed an additional assessment of CWS services to gather additional information on the extent to which career development planning is person-centered and on the alignment of ISP/CDP plans with the services being provided. The review of CWS revealed that although the client records include evidence of individual support planning and career development planning, the quality of the documentation does not meet the expectations and requirements of the ISA with respect to the definitions of person centered planning, integrated day services, and career development planning at Section II of the ISA, and the substantive requirements for integrated day services and career development plans at Sections VI and VII.

CDPs were located in 9 of the 10 records reviewed and were current in 8 of the 10. Only 5 plans (56%) clearly reflected the individual's preferences, goals, and desires, only three plans (33%) identified clear objectives that would realistically assist someone to pursue their preferences and goals, and only one plan (3%) appeared to have been developed via a true person centered planning process. Furthermore, of the 10 plans reviewed, only three included activities that were clearly related to the individual's goals and preferences and only two identified personal outcomes that would likely increase skills the individual needed to participate successfully in an integrated community setting (See CWS Site Visit Report Attachment I, Table 2).

A review of the alignment of the individuals' goals and preferences stated in the ISP/CDP with the services being received found little evidence of correspondence between the two. In addition, little evidence was found to suggest that plans and services were being offered in a person-centered manner as required by the ISA. Documentation that an individual was receiving all of the services that were identified in the ISP was found in only two of the 9 records. Less than half of the individuals in the review sample had records documenting their participation in vocational or situational assessments or trial work experiences. Furthermore, none of the records included evidence indicating that participants or their

families had been offered education and outreach opportunities or a chance to meet with individuals who were already working within community jobs.

DDD is providing oversight and technical assistance to CWS to improve its person-centered planning processes and the alignment of each individual's CDP, ISP, and MAPS/PATH Plan goals with the supports being provided. A multi-pronged approach is being used:

(1) The Division has required CWS to review the ISP/CDPs of each TTP Target Population member served and report to DDD on the status and acceptability of each individual's plan to identify problems with the alignment of services and actions that need to be taken to correct deficiencies. CWS has not yet completed its review.

| Table 1 Status of TTP Target Population Members' Career Development Plans by Provider Agency | | | | |
|---|---|---|---|---|
| Agency | Total CDPs | Acceptable | Not Acceptable | % Acceptable |
| CWS | 63 | 19 | 44 | 30% |
| PERSPECTIVES | 12 | 9 | 3 | 75% |
| FOGARTY | 4 | 1 | 3 | 25% |
| RE-FOCUS | 3 | 2 | 1 | 67% |
| ABE | 1 | | 1 | 0% |
| GOODWILL | 1 | 1 | | 100% |
| RICLAS | 2 | 2 | | 100% |
| CLRI | 1 | 1 | | 100% |
| LIVING INNOVATIONS | 1 | 1 | | 100% |
| WEST BAY | 1 | 1 | | 100% |
| Total | 89 | 37 | 52 | 42% |

(2) DDD has determined that the misalignment of individual plan goals and objectives with the services being provided is a problem that exists across all ISA and Consent Decree Target Populations as well as others receiving services from the State's IDD system. To address this issue at CWS and the other provider agencies, the division is merging its individual support-planning format with its person-centered career development planning process to reflect a whole life approach to service planning in a single document. This initiative is underway and will include stakeholder engagement through the newly established Quality Advisory Council launched in September 2017.

(3) To assist in the assessment of service plans the DD Division has constructed a review tool to assess the quality of CDP/ISP plans and activities at CWS as well as all other DD provider agencies. The assessment tool is based on the instrument developed by the Court

Monitor and used by the independent reviewer. DDD has affirmed the validity of the review tool and it will be ready for use by November 30, 2017. Staff and provider training on the instrument will be completed in December 2017.

(4) On October 29, 2017, CWS submitted to DDD its *Action Plan for Implementing an Employment Without Walls Pilot* outlining the steps the organization will take to "revamp" its ISP, CDP and PATH processes, increase participation in supported employment and supported employment services, and improve integrated day supports. This plan currently is being revised following DDD feedback. DDD will ensure that the final plan will include timelines with benchmarks related to the accomplishment of key changes and activities.

(5) DDD will use the aforementioned review tool to assess the quality and alignment of the service plans of each TTP Target Population member. Individual reviews are to be scheduled to coincide with each consumer's annual review date. The majority of individuals' plans and records will be reviewed by DDD by May 31, 2018 with the remainder completed by July 31st of that same year.

**Assessment: Requirement Not Met, Deferred.** This provision requires DDD to ensure the quality of Career Development Plans (CDP) and Person-centered Planning (PCP) for all active members and to confirm those individuals' goals and services align with their current employment interests. The Monitor's report filed on September 9, 2017 noted that this provision would be fully met when ISP/CDP content and alignment issues are fully resolved for all [active] TTP Target Population members. The State is actively addressing this provision of the Order but has not yet fully met this requirement.

DDD completed the required comprehensive review of the quality and alignment of each TTP Target Population member's ISP/CDP and person-centered planning by the July 31st deadline and is actively pursuing a plan to bring all records into compliance. The Division is working with CWS to ensure all unacceptable plans are remediated in conjunction with each person's annual review date. The actions are appropriate and are targeted to remediate identified deficiencies in individual records as well as in CWS program operations. The process is scheduled to take approximately 6 months to complete. Although the required

outcomes of this provision have not yet been fully accomplished, DDD has developed and is implementing a realistic strategy to meet this provision and is taking significant and tangible steps toward compliance with this provision.

**Recommended Actions**: It is requested that the State provide the Monitor and the U.S. Department of Justice with:

    a.  An Interim Summary Report on May 31, 2018 covering the calendar quarters ending December 31, 2017 and March 31, 2018 and identifying:

        i.  The number of ISPs and CDPs of ISA Target Population members previously determined to be unacceptable (52).

        ii.  The number of plans that were fully remediated with services appropriately aligned with individuals' goals and plans.

        iii.  The names of individuals whose plans have been revised and fully remediated.

    b.  A final report on July 31, 2018 updating the information stated in (a) above through July 31st and a description of the steps the State will take to ensure CWS' ongoing compliance with this provision in the future.

3.  **DDD will prioritize placement through its performance-based person centered supported employment program (PCSEPP) for all interested active class members before June 30, 2017. This will include outreach to each member identified in this order as not employed (46) to confirm interest in participation or satisfaction with current supported employment services received through the PCSEPP.**

**Status**: The first Monitor's Report filed on September 7, 2017 determined this provision to have been met. DDD was requested, however, to provide further information regarding the types of integrated or segregated day services to be provided to 46 individual ISA Target Population members who were identified as not employed. The following is an update of progress through October 31, 2017.

Of the 46 total unemployed individuals (Table 2): Thirty (65%) are actively engaged in employment or related services. Of this number, eleven (11) are employed in employer-paid

positions and are receiving a combination of supported employment, job retention, job development and other employment related services. Nineteen (19) individuals who have never been employed are engaged in integrated day services, pre-employment, job development or other supported employment services. It is important to note that the actively engaged individuals are receiving supports from seven different service providers.

The remaining 16 individuals who are not engaged in employment related activities are classified as follows: closed cases not interested in receiving services (5), not active or engaged (6), and not seeking employment or employment services (5). The State made phone calls and sent certified letters to each member to offer services; those who have not engaged have declined or not responded to the State's outreach to offer services.   The state and provider agencies will continue to engage with these individuals based on their personal choice. Individuals' preferences will be clearly and thoroughly documented in each person's ISP/CDP.

| Table 2 Employment Status of 46 Unemployed ISA Class Members | | | | |
|---|---|---|---|---|
| **STATUS** | **TOTAL** | **TTP** | **Birch** | **%** |
| **Actively Engaged** | **30** | | | **65%** |
| Employer Paid | 11 | 6 | 5 | |
| Never Employed | 19 | 14 | 5 | |
| **Not Engaged** | **16** | | | **35%** |
| Closed | 5 | 1 | 4 | |
| Not Active | 6 | 5 | 1 | |
| Not Seeking Employment | 5 | 5 | 0 | |
| **Total** | **46** | **31** | **15** | **100%** |

ORS reports that the agency has been involved and/or continues to work with all 46 individuals as follows:

10   Actively receiving employment services (2 employed, 8 not employed).

28   Case closed after plan and services were provided, individuals not employed.

1   Case closed with ORS prior to DDD eligibility determination.

1   Case closed as successfully employed after 90 consecutive days of employment.

1   Employed consistent with Individual Plan for Employment (IPE).

4   Receiving services - Consumer and Rehabilitation Counselor have developed the IPE that specifies a vocational goal, objectives, and services.

1   Case never opened.

**Assessment: Requirement Met.**  Additional information regarding the types of integrated or segregated day services provided to 46 individual ISA Target Population members who are identified as not employed was provided as requested.

4. **DDD will provide continued oversight of the CWS quality management plan, in compliance with the requirements of the ISA and Consent Decree as well as technical assistance in the areas of supported employment, integrated day, CDP development, and staff training on person-centered planning. ORS will assist DDD with quality management and review of ORS-related services.**

   **Status:** The Monitor's progress report issued on September 7, 2017 details the regulatory actions taken by the State with respect to CWS' failure to meet ISA requirements to implement integrated person-centered services required by the ISA, and to adhere to BHDDH regulatory requirements. On May 10, 2017, BHDDH notified CWS of its intent to revoke all licenses. Following a pre-hearing conference, BHDDH issued CWS a 90-day conditional license allowing the agency to continue to operate until December 31, 2017. BHDDH/DDD required CWS to develop a plan to address program deficiencies. In addition, a more specific plan and strategy was required by the State to resolve identified deficiencies in employment, person-centered practices, individual and career development planning. The *Action Plan for Implementing an Employment without Walls Pilot* was submitted by CWS to DDD on October 29, 2017. This plan is under review by BHDDH and DDD. DDD and ORS continue to provide oversight and ongoing monitoring to assess CWS' progress on meeting ISA and State standards through on-site visits, weekly telephone calls and regular email correspondence documenting service provision consistent with required activities.

   **Assessment: Requirements Met**

5. **DDD will develop guidance and standards for integrated day services by June 30, 2017. This guidance will be reviewed internally and externally and will be disseminated through the provider network no later than July 30, 2017.**

**Status**: Draft guidance and standards were developed for integrated day services in June 2017 and released for review and comment to provider agencies, advocates, and community partners as well as to the Monitor and the U.S. Department of Justice. DDD extended the comment period to gather additional feedback from provider agencies and other stakeholders. The standards were finalized, disseminated to provider agencies, shared with stakeholders and posted on the BHDDH/DDD website in September 2017 (http://www.bhddh.ri.gov/developmentaldisabilities/forms_provider.php). Through this dissemination process, providers were informed in writing of the Division's developing quality management plan that includes a comprehensive system wide assessment of areas of compliance and areas of need. Beginning in December 2017 and concluding by January 31, 2018, the assessment will guide and enhance ongoing training and provide a focus quality improvement activities.

 **Assessment: Requirement Met**

6. **DDD will require completion of Personal Action Towards Health (PATH) and McGill Acton Planning Systems (MAPS) for all Birch and TTP members at CWS who have not been provided this self-discovery opportunity by July 30, 2017.**

   **Status**: PATH plans were completed for all Birch and TTP members at CWS who agreed to participate in the process. Additional reviews of CWS documentation and services by the State and the Monitor have revealed that the majority of PATH Plans were prepared independently of the other planning processes for the ISP and CDP.

   **Assessment: Requirements Met.** PATH plans have been prepared and are in place for each Target Population member (None of the CWS participants currently have plans developed through the MAPS process). The lack of alignment of PATH plans with ISP/CDP plans and individuals' service preferences is being addressed by the State and CWS through the plans and activities being conducted with respect to Provision #2 of the Court's June 23rd Order as described above.

7.  **DDD will have a fully developed interim and long-term quality improvement plan, in accord with the requirements of the ISA and Consent Decree, complete with timelines and strategies by July 30, 2017.  ORS will assist DDD with implementation and monitoring on ORS-related services.**

**Status**: This provision has been met; DDD developed the interim and long term Quality Improvement Plan as required. An update provided by DDD on October 31, 2017 indicates that the previously submitted Quality Improvement Plan is being implemented. DDD is finalizing the process for contracting with a nationally recognized quality management expert to assist BHDDH/DDD in further developing and enhancing quality management needs and priorities. BHDDH is restructuring its current organizational format to support a centralized quality management division to manage and oversee program performance, investigations, protective services, and licensing. The reorganization adds a new associate director position to be announced in November. The centralized quality management division will be staffed with positions from DDD and Behavioral Health units.

**Assessment: Requirement Met.**

8.  **DDD will complete an in-depth review of all class members by June 30, 2017 to ensure the validity of data from multiple sources.**

**Status:** DDD reports that it has created and is implementing an accurate and valid data tracker to report valid information from multiple sources across all ISA Target Populations. The tracker is reportedly designed to gather data on the services furnished to ISA target population members by the 8 provider agencies (including CWS) currently serving them as well as by the Providence Public School District (PPSD). DDD indicated that summary data from the ISA Data Tracker will be reported quarterly.

During the past three years, CWS has been providing detailed monthly data summary reports to the Monitor, the Department of Justice and the State documenting services provided and outcomes achieved by TTP Target Population members receiving support from that agency. Delivery of these reports has not been consistent and the data included

within them frequently has been in error and in need of restatement, recalculation and clarification. A similar report has been provided to the Monitor and the U.S. Department of Justice by PPSD on a quarterly basis. This report, by contrast, has generally been detailed and accurate.

**Assessment: Requirement Met.**  DDD's plan to prepare and submit a comprehensive quarterly ISA Data Report documenting services and outcomes across all ISA Target Populations has the potential to significantly improve the validity and reliability of the information being reported. The relationship between the information gathered through the new ISA Data Tracker and the existing CWS Monthly Data Reports is unclear, however. In an effort to clarify data items and sources the Monitor will convene a meeting with key DDD staff, DOJ officials and others as appropriate to examine the information being collected across the multiple sources and determine the extent to which information is consistent with the requirements of the ISA. The focus of the meeting will be on determining the data to be collected, the methods of data gathering, sources of information, and strategies for improving accuracy of the monthly reports and the efficiency of data collection. The meeting will held via conference call and will be scheduled to take place during the first week in December 2017.

9. **DDD will amend its contract with Sherlock Center to include $50,000 for FY 18 for the purpose of benefits planning.**

**Status:** The amendment to the contract with the Sherlock Center was executed during the week of September 28, 2017. The amendment provided additional resources to an existing fully executed contract to address benefits counseling and planning.  The scope of the existing contract included technical assistance and remained consistent.

**Assessment: Requirement Met.**

**Section II. Placement Status –** No action required at this time. See Tables 2 and 3 for an updated breakdown of employment placement status for the forty-six individuals

## Section III. Job Placements

**In order to comply with employment placements, the forty-six (46) individuals requiring current action will be provided the level of employment supports and services in accordance with each individual's person-centered plan. In addition to integrated day services, these supports and services may include any or all of the following in accordance with the PCP: job exploration/discovery, job trials, placement, job coaching, and retention.**

**Status:** Current actions regarding job placements and the delivery of supports to the 46 individuals needing supported employment placement, related services and follow-up are described above in the sections addressing the State's progress on meeting Provisions 2 and 3 of the Court Order. The State is actively providing services to the 46 identified individuals including job exploration/discovery, job trials, placement, job coaching, and retention. Table 3 provides additional detail on the services received by the 46 individuals reported in Table 2 above.

| Table 3 | | |
|---|---|---|
| Services/Status | Consumers | Detail |
| Integrated Day | 4 | Not seeking employment |
| Job Development | 16 | 4 Employed; 12 Not Employed |
| Job Development/Retention | 1 | Employed |
| Job Discovery | 1 | Not employed |
| Job Retention/Career Exploration | 2 | Employed |
| Pre Employment Services | 6 | Not employed |
| Supported Employment | 4 | Employed |
| Not Engaged /Attending | 3 | Not active |
| Not Seeking Services | 9 | 5 Closed; 3 Not active; 1 Not seeking employment |
| Total | 46 | |
| Total Placed/Employed | 11 | |

<u>**Assessment: In Process – Assessment Deferred**</u>

## Section IV. Compliance Dates

**The State expects to place thirty-one (31) individuals, or two-thirds of those requiring employment placements, within twelve months. Of these thirty-one (31) placements, the State's goal is to place fifteen (15) individuals within 6 - 9 months and another sixteen (16) within the twelve-month period. The remaining fifteen (15) individuals, or one-third of the forty-six (46) requiring action, are likely to occur**

after twelve months.

**For each individual, the State will demonstrate its provision of person centered planning, job exploration, discovery, work trials, and vocational supports that align with the individual's preferences and needs. Data, including outcomes, regarding the forty-six (46) individuals, will be made available on a quarterly basis. The State will identify the specific individuals not placed within twelve months on a confidential basis and the reasons for lack of placement, if necessary.  The Court will later address a definitive timeframe for any individuals who have not been placed within twelve months.**

**Status:** The schedule for placing unemployed ISA Target Population members is summarized in Table 3. Placement data is to be provided on a quarterly basis beginning with the quarter ending September 30, 2017. DDD has expressed its intention to furnish this information as a part of the quarterly supported employment placement report that is filed with the Monitor. Placement information updated on October 31, 2017 indicates that, to date, 11 individuals or 73% of the 15 individuals who must receive a placement by March 23, 2018 have been placed (See Table 4 Placement Schedule).

| Table 4 Placement Schedule Updated October 31, 2017 | | | |
|---|---|---|---|
| Placement Goal | Timeframe | Target Date | Placements Made to Date |
| 15 | 6 - 9 months | March 23, 2018 | 11 |
| 16 | 9 – 12 months | June 23, 2018 | * |
| 15 | After 12 months | TBD | * |
| T = 46 | * To be completed | | |

It is important to note that of the 46 ISA Target Population members requiring placements, 25 are served by CWS. The remaining 21 individuals are served by other providers. The placement schedule for the 25 individuals served by CWS calls for 8 target population members to be placed by the end of March 2018, 9 participants by the end of June 2018 and the remaining 8 soon after.

**Assessment:  Assessment Deferred.**

**Section V. Site Visit Review**

The second part of this report summarizes the findings of an on-site review of CWS conducted by an independent consultant in collaboration with the Monitor in early October 2017. The purpose of the visit was to complete an in-depth evaluation of ISA compliance with respect to three broad areas: (a) the provision of person-centered planning and support services, (b) the alignment of person-centered plans and planning with the services that people are currently receiving, and (c) the structure and operation of integrated community based day services. A fourth aim was to assess the impact of the changes that are currently taking place at CWS relative to ISA requirements and in light of the regulatory action that State has taken at that agency.

The on-site assessment included interviews with the CWS program director and key administrative staff, reviews of the agency's records pertaining to 10 randomly selected individuals who are currently receiving services, and two site visits to observe members of the TTP Target Population receiving integrated day services. Findings and recommendations regarding person-centered career development planning and the alignment of service plans with the nature and content of services that are being provided are presented in Section 1.2 above. This section summarizes findings regarding the provision of integrated person-centered day services.

Reviews of integrated day services conducted by the Monitor and the independent consultant revealed that non-work integrated day services at CWS consist of a relatively narrow range of options in which people participate on a daily basis. The majority of individuals take part in activities that are selected from pre-set lists or menus that vary by the day, week or month. Most often, activities are accessed in small groups of three to 6 individuals. In the few situations in which CWS participants received individualized services and one-on-one supports the assistance was provided in the context of the larger group and was activity-based and non-participatory; people attend a community event, visit the zoo, walk through a park, go to a restaurant for coffee, spend time in the local library or in stores in the mall. While these take place in the community in the presence of others who are not disabled, they do not appear to lead to employment, expand an individual's social network or engage the individual in a

meaningful and productive activity. The non-work day services provided by CWS do not meet the ISA's definition of integrated day services.

The purpose of integrated day services is to provide individuals with disabilities with opportunities to fully engage with people without disabilities in the mainstream of community work and social life. Integrated community based day services, also referred to as community based non-work day services (CBNW) by DDD are described in the newly released BHDDH-DDD Guiding Principles and Standards for Integrated Day Supports (September 20, 2017) as, "… *supports and services that lead to the acquisition, improvement, and retention of skills and abilities that prepare individuals for work and community participation (p.1).* The description is consistent with the characteristics of integrated day services that are identified in the Consent Decree and the ISA: integrated day services "allow persons with I/DD to engage in self-directed activities in the community at times, frequencies, and with persons of their choosing during hours when they are not receiving employment or residential services (ISA Section II.A.6). The purpose and focus of integrated day services are clearly articulated, but practical and effective service delivery strategies for achieving the intended outcomes are less clear. DDD recognizes the need for education and provider training in this area. Through the Rhode Island College Sherlock Center Conversion Institute, the Division is providing training to providers and stakeholders on effective concepts and implementation strategies for developing and delivering integrated community day services. It is strongly recommended that this training be expanded and designed to strengthen the capacity of provider agencies to effectively link the supports that are being offered with the employment and community participation goals that are desired.

Consistent with State requirements, CWS is improving access to training in employment related skills such as resume development, job search techniques and mock interviews. The organization is working to increase the quality and person-centeredness of its individual support and career development planning process and plans to improve employment outcomes among people receiving support through the implementation of a new pilot program. CWS describes the pilot, referred to as *Employment Services Without Walls*, as designed to: provide fully integrated employment for individuals who are not yet employed; increase the number of hours worked by each individual; and enable participants to develop strong community ties and involvement through participation in community activities, friendship building and the

effective use of public transportation. DDD currently is reviewing the proposed pilot and its impact on CWS participants receiving support. A revised *Action Plan for Implementing an Employment Without Walls Pilot* is included at Attachment III).

These planned changes represent important shifts in CWS service delivery practices and hopefully will lead to improvements in individual supported employment placements. Although the pilot as currently described places a strong emphasis on employment, the plans and strategies for improving community based non-work support offerings for TTP Target Population members, by contrast, are not well defined or explained. For these individuals the structure and scope of community based day services and the content what people do each day has changed little over the past year. The majority of CWS participants continue to receive supports that have not been selected or developed through a person-centered process, are not individualized, and do not reflect individuals' needs and preferences. As such, TTP Target Population members served by CWS are receiving non-work day services that do not meet the requirements of the ISA.

**Recommendations:**

1. CWS recently submitted to the State its *Action Plan for Implementing an Employment Without Walls Pilot* program (October 29, 2017). It is recommended that DDD work with CWS to apply the same training and strategies used to develop occupational and employment skills through this Pilot Program to the creation and delivery of integrated and individualized community based non-work services for the people supported by the agency.

2. The ISA and the Consent Decree provide detailed descriptions of the nature and characteristics of integrated day services. However, many of the key components of these descriptions do not appear to be in evidence during service delivery. It is recommended that DDD assist CWS in developing operational definitions and descriptions of the integrated community based day services provided to ISA class members and include the specific outcomes to be achieved by and for each individual receiving support in each person's ISP/CDP during the process of CDP plan review/remediation described in Section 1.2 above. The operational definitions should directly reflect the definitions and descriptions of

integrated day services included in DDD's new standards and guidelines for day services, which reflect both ISA and Consent Decree requirements.

3.  The consultant's Site Visit Report (Attachment I) provides seven recommendations addressing organization change, the implementation of person-centered planning, the delivery of person-centered supports, and the creation and operation of meaningful integrated day activities. Some of these recommendations are already under development by CWS and the State or are included in current plans to improve quality, enhance staff training and other areas. DDD is requested to review the seven recommendations and report to the Monitor by December 31, 2017 on:

    a.  The report recommendations that are currently being addressed through existing State actions or initiatives.
    b.  The recommendations that require that additional steps to be taken and for each, the actions the State will take and related timelines for completion.

Respectfully Submitted

Charles Moseley EdD
Court Monitor
November 28, 2017

## ATTACHMENT I

### Review of CWS Services

***William H. Ashe, Ed.D***

**Independent Consultant**
870 South Barre Road
Barre, Vermont

<u>**Privileged and Confidential Report for Use and Distribution by the Recipient at his Exclusive Election**</u>

October 19, 2017

Dr. Charles Moseley
Court Monitor U.S. District Court
Rhode Island Consent Decree and Interim Settlement Agreement
PO Box 544
Charlotte VT 05445

Dear Dr. Moseley;

At your request a site visit to Community Work Services (CWS) was conducted over a three day period commencing on October 4, 2017 and concluding on October 6, 2017.  The purpose of this visit was to follow-up on the progress being made by CWS with the compliance expectations as defined by the Rhode Island Consent Decree and the Interim Settlement Agreement. This visit was conducted by you in your capacity as the designated U.S. District Court Monitor, and by me as a Consultant to you in this process.

I have been able to visit Rhode Island provider agencies in this consulting capacity on several occasions, the most recent being in November and December of 2016. This visit was specific to a review of how Rhode Island agencies were approaching the delivery of Integrated Community Based non-Work day services. In addition to this review in 2016, I also had the occasion to visit CWS during October of 2015. While this review had a broader focus than this current visit (looking at both work and non-work efforts) a number of recommendations were made following this visit and are detailed in my November 17, 2015

report. The nature of Career Development and Person Centered Planning was addressed in my earlier reports, and remained important theme during this most current visit.

**General Conduct of the Review**

The current three-day visit included a detailed record review of ten participants. Included in these three days, we also devoted one half day visiting two community based locations where non-work activities were taking place.  As part of these two site visits, we had the opportunity to visit the meeting place where CWS participants gather prior to departing on their daily schedules. Lastly, we were able to begin our visit with a discussion with Lori Norris, the current manager of the CWS Program. Each of these three distinct portions of our review will be separately discussed.

**Beginning Discussion with Lori Norris**

Ms. Norris has been in the Director's position for CWS for approximately six months. During our discussion, Ms. Norris was candid in her comments stating that the CWS program status at the time of her appointment was very inadequate across most areas of performance. She described her efforts over this past six month period to change the culture of CWS. This resulted in a large amount of turnover in staffing which she described as being essential to this culture change.  Her clear focus is on getting people out of segregated activities and into community opportunities of the individual's choosing.  She reports that she recently had an opportunity to visit a program based in Maine (KFI) and from this visit she has a clear sense of what CWS needs to accomplish and how to make this happen. As part of this conversation she stated:

1. She has discontinued renovation work on the current CWS facility, as of January of 2018 CWS will not need to rely on a facility presence for the delivery of it programs.

2. She has discontinued the practice of using vans to transport groups of participants. Necessary transportation in the future will be arranged and provided as needed in personal staff vehicles.

3. She is changing the position title of direct support staff to Community Advocate believing this title better reflects the culture change she wishes to establish, and more accurately conforms to the expectation for how she wants staff to approach their work.

4. She indicates that she would like CWS to focus more on people who have employment as a goal. She feels they are better skilled providing employment services then they are at providing integrated non-work. Ms. Norris states that she recognizes CWS will need to provide integrated non-work support for anyone who needs this service in addition to their employment.

5. Ms. Norris states that CWS will offer people what they want and need and that this will not be restricted to a Monday through Friday 8:00AM to 4:00PM schedule.

6. Ms. Norris stated that she will begin with a pilot group using a Case Manager who will be assigned a caseload of only 5 to 6 participants. From this pilot she will expand the support model throughout the entire organization.

7.  Ms. Norris states that her superiors at FedCap are committed to success and will assure the proper level of staffing support even if this resource level is greater than what the current billing authorizations will support.

8.  Ms. Norris states that she is hoping that major change will occur within the organization by the end of this calendar year (2017).

It is fair to say that the current CWS leadership has a very good grasp of the reality that significant change in their organizational structure and performance needs to happen within a fairly short time frame. It is also fair to say that the current leadership is very positive about their ability to make this change occur. Ms. Norris and her staff appear to have a vision about where the organization needs to be, and there is no question that the commitment to make this happen is present. They do not have a written plan to support this thinking however, and it is this writer's view that having such a plan would be helpful, both in terms of tracking CWS' progress internally, and also to demonstrate this progress to stakeholders who are external to the organization.

**Records Review**

This visit involved the review of 10 records. The intent of this portion of the review was to understand the extent to which the organization's practices followed a person centered planning approach, and to see if the participant records provided documentation that was reflective of such an approach. This portion of the review was also designed to assess the extent to which a participant record contained information that is required by the Interim Settlement Agreement (ISA). The form used in this portion of the review was developed by the Court Monitor and is titled <u>CWS/TTP Individual Review Form</u>. A copy of this form is provided as Attachment A.

The review of the records themselves was quite time consuming and at times difficult. The records are kept in bulky three-ring binders and contained current as well as multiple years of information. In numerous instances documents that we were looking for in the paper record were actually located in computer files that had not been transferred to the paper record we were examining. This was true for many of the PATH[1] documents and case notes. CWS staff reported they were in the process of rethinking the design of their records system. Some of the staff are using the computer while others are not. While we did the best we could in the time we had available, it is possible that we might have missed some of the documents referenced in this report. Creating a more usable record format needs to be a high priority for CWS as they forward.

**Weekly Hours of Integrated Community Non-Work**

Table 1 presents information on the average number of hours each week that a participant was scheduled to be involved in Integrated Non-Work day services. For these 10 participants the number of hours per week of integrated non-work ranged from 0 hours to 31.5 hours, with an average of 25.48 hours per week per person. From what we could determine from the records, these hours were spent in small group activities, although it is difficult to be precise here. Staffing ratios did include some individual support

---

[1] PATH: Planning Alternative Tomorrows with Hope. A futures planning tool for individuals with disabilities, families, organizations and schools to build caring inclusive places to live, work & learn.

[2] Amado, A.N. (2013). *Friends: Connecting people with disabilities and community members.* Minneapolis, MN:

**1 |** P a g

hours in addition to group participation. Based upon what we were told this varied dependent on the activities as well as the needs of the individual.

| Table 1. | Weekly Hours of Non Work Day Supports (N=10) | |
|---|---|---|
| | **Person** | **Hours** |
| 1 | SD | 31.5 |
| 2 | CM | 25 |
| 3 | NG | 32 |
| 4 | RR | 33.5 |
| 5 | RB | 27.5 |
| 6 | MA | 24.5 |
| 7 | SV | 23.25 |
| 8 | FB | 27 |
| 9 | RF | 0 |
| 10 | EC | 30.5 |
| **Average** | | **25.48** |

How participants spent their hours of day support was in part a function of individual choice, and in part the result of the options that were made available for them by CWS staff. As such, while there is an element of choice and self-direction evident, this falls short of a real person centered approach in that an individual did not appear to have the ability to choose something what was not on the options list. While the opportunity to select an activity from a list of pre-set options is a significant improvement over having an agency determine how someone will spend their time, the menus were not the outcome of a real person centered practice. For example, the schedule for Thursday October 5th allowed people to select from a menu of approximately 10 activities including swimming, weight training, walking, an Arcade, a computer class, or work readiness activities.  Friday October 6 provided a similar array of options from which a person could choose.

At the time of our visit, all participants would arrive at a central space. As CWS was not able to accommodate this grouping at their own location they had made an arrangement with another provider (The Fogarty Center).  Everyone would arrive at this location between 8:00AM and 9:00AM, select their activities, and then these small groups would leave with support staff for these events. The level of effort getting all of this organized was on the chaotic side, but nevertheless was being pulled off. The use of this type of center based launching point is recognized by the CWS leadership as not being ideal, and is one of the areas that CWS leadership has targeted for change.

**Person Centered Career Development Planning (ISP/CDP)**

This portion of the records review examined the extent to which person-centered practices and a well thought out person-centered planning approach were evident in the Career Development Plan (CDP) and the Individual Services Plan (ISP). The ISA requires both documents to be created through an effective person centered planning process. Table 2 presents the results of this review.

| Table 2. Person-centered Career Development Planning (N=10) | | | | |
|---|---|---|---|---|
| | | **Yes** | **No** | **Unkn** |
| **1** | CDP on file | 9 | 1 | |
| **2** | ISP/CDP reflects the individual's preferences | 5 | 5 | |
| **3** | ISP/CDP has clear objectives | 3 | 7 | |
| **4** | ISP/CDP developed thru a person-centered process | 1 | 9 | |
| **5** | Goals important **to** and **for** the individual are present | 3 | 7 | |
| **6** | Essential supports and barriers identified | 3 | 7 | |
| **7** | CDP is current | 8 | 2 | |
| **8** | Person participated in the ISP/CDP | 7 | 3 | |
| **9** | Person's representative/family participated in planning | 8 | 1 | 1 |
| **10** | Goals relate to person's talents or preferences | 3 | 7 | |
| **11** | Specific outcomes increase needed skills | 2 | 8 | |
| **12** | Person receives all supports identified in the plan | 2 | 4 | 4 |

As can be seen in Table 2, Career Development Plans (CDP) were found in 9 of the 10 records reviewed. Of these 10 records the CDP was current within 8 of them. Of the nine plans that were found, only 5 plans (56%) clearly reflected the individual's preferences, goals, and desires. Even fewer, three plans (33%), identified clear objectives that would realistically assist someone to pursue their preferences and goals. Only one (3%) of these plans appeared to be developed via a real person centered planning process.

The goal of the person-centered planning methodology is to have the individual receiving support clearly guiding the support planning process. This was not generally the case. Each of the records reviewed contained a PATH document, but often the PATH was a reflection of the current status, listing the services and supports being received, and not a guiding document based on a person's hopes and dreams and future goals. In most instances the process was disjointed with the PATH, CDP, and ISP being developed at difference times. Goals were in some instances different on the CDP and the ISP. ISP's were often similar and at times identical when the most recent ISP was compared to previous years. Career goals were often very general and rarely included specific objectives that would establish a clear sense for how an individual would move forward towards the attainment of important personal goals. Generally, individuals' goals appeared to have been developed by staff and were most often ones that were good **for** the person, but were not necessarily important **to** the person themselves. In three of the ISPs' there was not an indication that the individual was a participant in the development of the plan. Of the 10 plans reviewed, only 3 of these plans clearly related to an individual's goals and preferences, and only 2 demonstrated that outcomes would likely increase skills needed to participate successfully in an integrated community setting. Only 2 plans demonstrated that the individual was receiving all of the services that were identified in the ISP document.

In summary, although individuals' records generally include the required career development and service planning documentation, there was little evidence that plans and services were being offered in a person-centered manner as required by the ISA. CWS has considerable work ahead to become a truly person centered organization. More will be said about this later in this report.

**Benefits Planning**

Benefits planning is a requirement of the Consent Decree and the Interim Settlement Agreement. It is expected that all persons receiving CWS' supports would have received benefits planning information and that documentation of this activity would be found in the individual records. This was not generally the case as can be seen in Table 3.

For the 10 records we reviewed, benefits planning was only documented for 3 individuals, and we were able to locate only 2 of these plans within the participant's records. Having benefits plans in all the records should be a high priority for CWS.

| Table 3.  Benefits Planning (N=10) | Yes | No |
|---|---|---|
| Person Received Benefits Planning | 3 | 7 |
| Benefits Plan located in the record | 2 | 8 |

**Other Areas Examined**

As part of our review we were also interested in documenting the receipt of other services and activities required by the ISA including: vocational assessments; trial work experiences outreach education and support; opportunities to speak with others currently working in integrated jobs; the presence or absence of Consent Decree Variance requests; the need for accommodations needed to enable an individual to participate successfully in a community based setting, and others. Table 4 provides an overview of the findings in these areas.

| Table 4. Other Documentation | Yes | No | Unkn |
|---|---|---|---|
| 1.   Participated in a vocational/situational assessment | 4 | 5 | 1 |
| 2.   Completed a trial work experience | 4 | 6 | |
| 3.   Received outreach, education & support | | 10 | |
| 4.   Person/family had opportunity to speak with others | | 9 | 1 |
| 5.   Consent Decree variance requested | | 10 | |
| 6.   Requires physical adaptations or devices | 1 | 9 | |
| 7.   Requires communication aides or assistance | 2 | 8 | |
| 8.   Receives communication services | | 3 | 7 |
| 9.   Physical or communication assistance is provided | 1 | 3 | 6 |

As is shown in Table 4, based on the documentation we examined, less than half of the individuals in this sample had participated in a vocational or situational assessment, or had been able to access a trial work experience. There was no evidence in the records we reviewed that indicated participants or their families had been offered outreach opportunities or a chance to meet with individuals who were already working within community jobs. There was also no evidence in the records that anyone in the sample selected for this review had applied for or requested a variance to be served in a segregating setting.

As we reviewed records we also looked for information that would identify the need for any accommodations or adaptions to address physical impairments or other barriers that may impede an individual's ability to participate in integrated employment or in integrated community day services. Our review of the records suggested that ninety-percent of the individuals sampled (N=9) did not require

physical adaptions. The single individual who was identified has severe visual impairments and uses a cane. There were also two individuals where it appeared communication aids or assistance were necessary. For these two individuals, there was no indication in the record that communication services or supports were available and were being provided.

One final question concerned the presence of evidence in the participant's record that staff had received the training necessary to support the person in accordance with his or her plan. This information is not available in any of the files of individuals served by CWS. CWS does maintain a record of staff training topics that are offered but these records are kept separate from the participants' records. In this regard we were able to see specific documentation of staff participation in a variety of important training sessions, including completion dates and credentials. These training sessions were varied and included topics such as job coaching, vocational assessment, job development, and person centered planning. Some staff had received training certificates from FedCap. It is important to note that DDD no longer accepts FedCap training that was provided prior to 2017.

Regarding person-specific training designed to address the specific needs of individuals receiving support, during our discussion with CWS leadership staff we were informed that they use an on the job training approach for preparing new staff to work with individual participants. No specific records were maintained that document this activity on a person-by-person basis. There is also no information available in the participant records that provide staff with a specific overview of who the participant is and what is important for staff to know about the person that would better prepare them to provide appropriate levels of support.

**Visits to Community Locations**

During the morning of October 5th we visited two locations that were included in the schedule of available activities for the morning. These two events were the "Connect 2 Careers Prep Session" held at the FedCap office location in Warwick, and the other was the "Work Readiness Event" held at the Providence Chamber of Commerce.

As mentioned above, the morning began with everyone meeting at a central location at The Fogarty Center. As one might imagine this was quite a hectic scene as participants learned about and selected from a menu of preset day activities. A great deal of coordination needed to occur in a short amount of time to give participants the information they needed to select where they wanted to go and to make the logistical connections to get the resulting small groups of people on their way to the activities that they had chosen. This time (8:00AM-9:00AM) was also used as a 'Discovery Chat Session" where CWS' Business Developers would present to participants any new and potential job opportunities that had been located and were available to be filled. This was in part to assess interest levels for any opportunity that had been located.

<u>Connect 2 Careers</u>

Connect 2 Careers is an event that is planned where a group of community employers are brought together to meet CWS participants in a practice interview session that is described by CWS as being set up like a "speed dating' event. Participants sit across a table and are interviewed by an employer. After a few minutes have passed the participants rotate to another employer. This process continues until the available time has elapsed. While the primary goal of this event is not job creation or placement, CWS staff state that this in fact is an outcome that typically occurs.

In order to participate in the Connect 2 Careers event, participants first go through a process of preparing a resume, practice proper social greeting skills that are appropriate for an interview setting, and rehearse how to answer typical questions that are posed during the interview process. The activity that was occurring at the FedCap location was for the purpose of preparing participants to participate in the upcoming Connect 2 Careers event, scheduled for October 19, 2017.

On this particular day three participants had chosen this event, which took place in a classroom style room located at the FedCap office in Warwick. This location resembled a storefront and was part of a small commercial complex where several other businesses were also located.  On this morning there were three CWS staff available so each participant had 1:1 support during the entire session which lasted approximately two hours. During these two hours each participant was assisted in preparing an undated resume. Following this the balance of the session was spent role-playing the actual interview process. This activity, while not integrated, was very well planned. The three CWS staff interacted and supported the participants extremely well. The activity was very purposeful and assisted the three participants in learning ways to present themselves successfully during an actual interview process.

At the end of the session there was sufficient time to chat with each of the three participants. One person struggled with communication (Person 6 in Table 1) but had been assisted to create cards to assist her with the interview process. Another person (Person 1 in Table 1) was very excited as she had just secured a paid position that was scheduled to start the following week. The third person (person 2 from Table 1) was very clear about wanting to work and about the type of work she wanted to do. She was also challenged by a severe vision problem which will require some creative thinking (but certainly doable) to enable her to be successful within a position of her choosing.

<u>CWS Work Readiness Event</u>

A total of nine participants chose this event for their morning session which was conducted at the Providence Chamber of Commerce located in a downtown commercial business district. Three CWS staff were present to assist the nine participants in three general areas, (a) updating resumes, (b) reviewing areas of employment interest and jobs in the area, and (c) conducting mock interviews. Activities within each of these three areas were well planned and geared to the individual participant. One participant, whose primary language was Spanish, was supported by a bi-lingual staff member. Participants were encouraged to ask questions (e.g. "When the job coach fades will I still be supported?"), and the questions were answered in an appropriate and person centered fashion. Staff interactions with participants were sensitive to participant's concerns and questions (e.g. it is normal to be nervous during an interview), and the presentation of information was tailored to the needs of each person. All participants were observed to be extremely interested in this session and in the potential of securing employment. Much of the class time was very interactive with people appearing to feel comfortable sharing about the types of jobs they have had in the past, what they liked, what they didn't like, and what jobs they would be interested in for the future.

While this class was not an integrated event, it was well designed and presented by staff who were knowledgeable and prepared for this assignment. The participants in this class clearly wanted to be there, and the information that they were receiving was useful and relevant to the goal of employment which all of them were clearly interested in achieving.  At times the single person who only spoke Spanish appeared to be lost and disconnected from the group discussion portion due to the barrier of language.

Overall a lot of essential information was shared about job experiences and interests which should greatly inform a person centered job development process.

Visit Summary

Both activities were organized around the similar theme of getting employed and, while differing in approach, both events were structured, well designed, and useful for the participants who chose these activities. Staff were well prepared for supporting participants in these settings, and participants all seemed to enjoy the activities. Neither of these events were themselves integrated. However, they were well linked to the potential for integrated employment at some future time. What could not be determined from the visits or from the review of the participants' records was a sense of the time frame within which an employment opportunity would likely be created. This is a key variable because readiness events such as observed during our visit are really only good and productive if the outcome is actually getting a job.

There are several positive things to say about these two events. For example, the satisfaction level of the participants appeared to be quite high. Staff clearly enjoyed working with participants as did participants with the staff. The activities were relevant to the individuals' stated interests, and all appeared to be well suited for employment. Unfortunately, the positive aspects of these events are not described and do not come through in the records. There should be a closer correlation between the goals and objectives included in the individual records and the events and activities that individuals are engaged in during the day. For example, a common goal with an ISP was to acquire and maintain employment. Missing in the records were more specific objectives and strategies for how an individual would actually achieve the goal of employment. The use of goals with clear objectives and implementation strategies would clarify the relationships between the training and experiences that are provided with the outcomes to be achieved. This would make it easier to track progress and document outcomes that are important for the individual. Records should not only meet technical compliance and billing expectations. This approach also should facilitate the ability of the agency to tell an individual's story and the steps that are being taken to make his or her goals, dreams, and aspirations a reality.

**Findings and Overall Impressions**

At the present time at CWS there is a high level of energy and commitment to a change process that hopefully will lead to an organization that is focused around person centered planning and person centered thinking. There is also an apparent willingness from CWS leadership to develop the necessary expertise to make these changes happen. Implementing change will be a challenging and tine consuming process but CWS is very different from the organization that was visited some two years ago.

CWS leadership appears committed to restructuring the services and supports that it provides to comply with the ISA and State regulations. Although near term changes are becoming evident, the vision for the future structure and functioning of the organization is unclear. There should be a written plan that articulates where the organization is going, that clarifies a new mission and vision, and provides some sense of the steps that will be taken to implement the change over time. A voluminous change document is not being suggested here, but rather a working document that provides a strategic plan to guide the organization in its efforts to move forward.

One of the challenges with a change effort is to keep as many of the essential partners as close to the change process as possible. A change process that neglects this essential step may lose momentum due

to the loss of necessary external supports. Key change partners in the present instance include all of the participants currently at CWS along with many family members, CWS staff, provider organizations who share service delivery with CWS, DDD, and ORS. It is beyond the scope of this report to describe the nature of these partnerships. However, it seems important that these partners feel connected and supportive of CWS' change process. This will be best facilitated by a written plan for change.

Based on this review, there are a number of areas of significant importance that need to be addressed as central themes in the process of moving forward. These include clarifying the mission and values of the organization as well as evaluating current practice against what a person centered model really needs to be. Staff, at all levels of the organization, need to understand and practice these values. This approach, at its core, moves from an agency focus on providing services, to the role of assisting individuals to realize the type of life that they want for themselves. In this regard the role of an agency and its staff is to help individuals locate opportunities that are important to them and to support them in experiencing these opportunities through a self-directed and independence oriented framework. These opportunities must also include an expansion of an individual's social network. People need to have friends and this must include people who have shared interests and whose involvement with the individual is based on reciprocal relationships and not on a financial dependency.

A significant portion of the visit to CWS involved a review of records. As can be seen in the records review section of this report, there are considerable problems with the records as they are currently structured. There was very little person centered planning reflected in these records. ISP's reviewed were most often very similar to the ISP from the previous year. Goals were broad statements, and there were few clear objectives and strategies for how the objectives and goals were to be realized. There were Career Development Plans in these records, and they were somewhat better than the ISP's in terms of reflecting what the person wanted. However, they were in most instances isolated from the ISP and often the goals in the CDP and the ISP were different. There were PATH documents in the records and these were better than most of the ISP's and CDP's, but often these PATH documents also fell short of identifying a future that the person wanted to strive for. Many of these documents did a better job of describing the present than they did describing the future. Finally, virtually none of the records we reviewed included information regarding individual goals or objectives that had been successfully achieved or identified the the skills that were learned as a result of the services and supports that were received.

The planning process needs to become integrated into one activity that: (a) is directed by the individual, (b) includes goals and objectives are consistent across all documents, (c) provides a clear sense of where the person is heading (long term goals), and (d) provides clear strategies for how CWS and the person working together are likely to reach the goals. There also needs to be a more comprehensive view of the specialty supports someone may require in order to successful.

As an example, one person with Autism was described as experiencing behaviors that were limiting his ability to be involved in his community. But there was no plan in the record on how to support this person to self-regulate his behavior more successfully. Another instance was a woman with a severe visual impairment who wanted to work but her record included no plans for evaluating environmental requirements or providing needed accommodations. In other instances there were individuals who had communication difficulties but their records did not include any type of discussion of how to address these communication needs within the context of either employment or an integrated non-work settings. There should be support plans in the records of people with these types of needs, and these plans should explain the support strategies that all staff should know.

Staff training needs to include specific instructions on how to meet the personal support requirements of each individual supported by CWS in addition to the more generic in-service education on safety, job coaching, etc. This is particularly the case in those instances where some aspect of the person's disability is a barrier to the individual being able to pursue their own life goals.

CWS needs to achieve a stable workforce. The turnover has been high, and while some of this was likely necessary it also seems that CWS may have lost some real talent as well. The organizational changes that are being planned as described by Ms. Norris are very interesting and appear to have potential for empowering smaller teams of people to support participants in a more personalized manner than has historically been the case at the agency. Creating such teams that have a freedom to explore and be creative, should improve person-centered outcomes while simultaneously helping to create a culture that is increasingly person centered in its orientation. This should reap many benefits and one of these will likely be better retention of the valued staff.

CWS reports that it is more comfortable offering employment services than it is with integrated non-work supports. In reality this might also describe the view of any number of organizations that struggle with providing valued person centered non-work that is individualized and integrated. The director indicated that the agency is considering only serving individuals who are employed or who are on an employment track, even though they recognize that these individuals also will need to have an integrated non-work component to their day. It will be important to determine what the future direction of CWS will be. Irrespective of this, however, the challenges associated with individualized integrated non-work options will likely be a component for CWS going forward.

**Recommendations**

As a result of this review the following recommendations are made for consideration at CWS.

Recommendation 1:    Develop a Written Plan for Organizational Change

At present, numerous changes are occurring at CWS and for the most part the changes that are being implemented are moving the organization in a positive direction. Having a written plan that outlines where the organization was intending to go and in general how it intends to get there, is needed to establish benchmarks that are clear for the organization as well as for external stakeholders for measuring progress and the change process. Such a plan will not impede the change process but enable it as it will provide for clarity and for accountability.

Recommendation 2:    Provide Training on Person Centered Planning and Person Centered Thinking

The current individual plans found in the participant records are not developed in a person-centered fashion. Bringing in outside (expert) training that would both inform and augment the training that CWS itself is providing should be considered. Everyone in the organization should be well trained in both areas and an in-depth understanding of person-centered practices should become the contextual framework within which CWS will operate into the future. Levels of proficiency in person-centered thinking and service delivery should become the expectation for all CWS staff.

Recommendation 3:    Develop and Implement a Coherent Person Centered Planning Process

The goal should be for the participant to lead (self-direct) his or her own future. The current disconnected system where the ISP, the PATH, and CDP are completed separately should be replaced

with a single process that incorporates all of these elements into one integrated experience. Planning activities need to embody a coherent approach that clearly identified key goals, events and activities that are important *to* and important *for* the individuals receiving support. Currently, this is not the case.

<u>Recommendation 4</u>:   Define the Required Plan Content

Each person's plan should begin with an exploration to define and describe each person's goals and dreams. This exploration should result in reasonably specific goal statements. These goal statements should be broken into measurable and attainable objectives, and there should be a strategy developed for how a participant and CWS together work towards achieving each of these goals. There should be a way to modify these goals, including adding new goals, at intervals that make sense to the individual.

<u>Recommendation 4a</u>:  Include Specialized Supports

During our review it seemed clear that some individuals needed specialized supports and assistance in areas that were likely beyond the expertise of existing CWS staff. The examples mentioned in the discussion above include behavior support assistance, self-regulation skill training, mobility training, environmental modifications, and communication training and enhancements. The person centered planning process needs to address these and other areas in order to remove or minimize barriers that prevent someone from participating in their community. This planning also needs to include a mechanism for how individual staff will be trained and retrained as necessary in the support strategies that are deemed important for the individual participant.

<u>Recommendation 5</u>:   Develop the Capacity to Provide Meaningful Integrated Non-Work
                Day Services

As with most agencies, CWS approaches the provision of non-work day services by providing a range of activities in which people attend or participate in on a daily basis. While these activities may be community based and occurring among other individuals who are not disabled, they rarely lead to an expansion of a person's social network or to employment.

It is recommended that CWS work with DDD to clearly define the nature and desired outcomes of each activity for each participant. Should the outcome be presence in the community, than a rich array of activities may suffice. But if the desired outcome is more than presence, and is about participation, consistent with the ISA, then a rich activity schedule will likely not lead to this outcome.

<u>Recommendation 5a</u>:  Train CWS Staff on a Model of Inclusion

Expanding an individual's social network involves the process of making friends. The model promoted by Angela Amado would be a very good starting point.[2] Consideration should be given to making the training that she provides available to CWS staff.

<u>Recommendation 6</u>:   Assure that Everyone at CWS has received Benefit Planning and that the Written
                Summary of this is in the Individual Records.

---

[2] Amado, A.N. (2013). *Friends: Connecting people with disabilities and community members.* Minneapolis, MN: University of Minnesota, Institute on Community Integration, Research and Training Center on Community Living.

Benefit planning is a requirement of the ISA and the Consent Decree. CWS needs to make certain that these plans are completed for all participants and is available in each person's file.

Recommendation 7:   Select and Implement a Coherent Record System

The current record system appears in disarray. Each file includes an index with documents organized under multiple sections separated by dividers with labels or tabs indicating  "ISP," "ORS," "Assessments," etc. While there is an index, locating materials, such as career development plans or case notes in the current records is quite difficult. In one instance, for example, a Career Development Plan was attached to the ISP. In another it was found under the ORS tab. In yet another it was located under the Assessment tab. In at least two records there were three copies of the same Career Development Plan. Each record includes a sign in sheet under the front cover to document the date that the record was reviewed, the staff or individual accessing the record and the purpose. Typically, documentation of access was out of date and incomplete. Several records had no signature appearing for well over a year, even though the dates on the documents in the records would require an access signature. Recent case notes were generally not placed in the paper record but were located in a computer file. Some of the day support staff were authorized to use the computer for Case Notes, while others were not. PATH documents were most often not in the paper record but were located in a separate file and needed to be requested in order to be seen. Dates on the PATH documents indicated that they were rarely completed in conjunction with the development of the ISP or the Career Development Plan.

It is recommended that CWS select a records format (electronic or otherwise) and put a coherent record system in place. The use of the system should be governed by CWS records policies and consistent with DDD requirements. This will take some time to implement but will be an extremely important step to take.

**Summary**

This report summarizes a review of Community Work Services (CWS) completed on October 4th, 5th, and 6th, 2017. The purpose of the visit was to assess the current status of CWS' efforts to meet the expectations and requirements of the Rhode Island Consent Decree and the Interim Settlement Agreement. The visit was conducted by the Court Monitor and me, and included three components: (a) an interview with Lori Norris, the FedCap representative who is directing the CWS program; (b) an in-depth review of the records of 10 current CWS participants; and (c) a visit and observation of two separate locations during times when non-work activities were being provided. As part of this visit we were also able to observe some of the activities at the initial gathering point at the Fogarty Center where participants meet to choose their daily schedules.

The body of the report provides a detailed overview of each of the three phases of this review, presenting overall impressions of the current CWS program, assessing services and documentation, evaluating the efforts taken to date to improve services and providing specific recommendations that are intended to assist CWS and the State in meeting the requirements of the ISA and Consent Decree.
It has been almost 2 years to the day that I last visited CWS. At that visit I made a number of recommendations including ones that overlap with the recommendations that are made in this current report. It was my hope that more gains would have been made over these 24 months than has been the case, particularly in the degree of sophistication of the person centered planning process. Having said this, however, there does appear to be a real commitment and motivation by the current CWS leadership

to make positive things happen, and in fact over the past 6 months a number of decisive and important steps have been taken. There is, however, a long way to go as has been discussed in this report. It is my sincere hope that the change effort at CWS will continue in a manner that transforms this organization into one that demonstrates an active culture of person centeredness. There are some early signs that this process of evolution may be taking root.

I thank you for the opportunity to participate in this review. If I can be of any further assistance to your office please do not hesitate to contact me.

Most Sincerely,

William H. Ashe, Ed.D.
Independent Consultant
870 South Barre Road
Barre, Vermont  05641

**Attachment A**

# Rhode Island Consent Decree and Interim Settlement Agreement
## Court Monitor Review
# CWS/TTP
# Individual Review Form
## September 2017

Individual Receiving Support (Initials only):

Reviewer (Initials):

Date of Review:

1. **Please check if this individual receives:**

   a. Community Based Day Services **only** _____

   b. Community Based Day Services **in addition to** Supported Employment _____

   c. Supported Employment only

   d. Additional or more intensive supports for complex or challenging conditions or needs

   _____

2. **Day Service and/or Supported Employment Setting:**

   a. Does the file include a description of the employment or day services being provided?

   b. If yes, briefly describe the setting(s), the specific services or supports received, and whether or not each setting is integrated in the community or facility based.

## Records Review

3. **Day support received in January 2017.** <u>Please enter the approximate number of hours per week</u> that the individual received for each service type listed in the chart below.

| Service | Integrated | | Segregated |
|---|---|---|---|
| | **Individual** | **Group** | **Facility-based** |
| Non-work Activities | | | |
| Natural (Unpaid) Supports | | | |
| Paid Employment | | | |
| Other | | | |
| **Hours Per Week** | | | |

## ISA/Consent Decree Requirements

| | | Yes | No / No Data | Date |
|---|---|---|---|---|
| **1. Person Centered Career Development Planning (ISP/CDP)** | | | | |
| a. | Does the individual have a **CDP** on file? (add date) | | | |
| | If no, does the person have an **ISP** with employment objectives? | | | |
| b. | Does the ISP/CDP include a clear statement of the person's employment preferences, goals and desires? | | | |
| c. | Does the ISP/CDP include clear performance objectives, skills or behaviors that the person needs to achieve to accomplish his/her employment goals? | | | |
| d. | Was the ISP/CDP developed through a person-centered planning process? | | | |
| e. | Does the ISP/CDP identify goals and activities that are important *to* the individual as well as goals and activities that are important *for* the individual? | | | |
| f. | Are essential supports, barriers and strategies to remove barriers identified in the ISP/CDP? | | | |
| g. | Is the CDP current? (Provide most recent date) | | | |
| h. | Is there evidence the person directly participated in his or her ISP/CDP? | | | |
| i. | Did the person's family or authorized representative participate in the ISP/CDP? | | | |

| | | | | |
|---|---|---|---|---|
| j. | Do the goals and outcomes of the individual's day services <u>relate to</u> his/her talents, preferences and needs as identified in the assessments and individual support plan? | | | |
| k. | Does the ISP/CDP identify specific outcomes and support activities that lead to employment skill development or increase the ability to participate in integrated community activities? | | | |
| l. | Is the individual receiving all of the supports and services identified in his or her plan? | | | |
| **2.  Benefits Planning** | | | | |
| a. | Did the individual receive Benefits Planning Services? (Add date) | | | |
| b. | Does the individual have on file a benefits plan or written analysis of the impact of earned income on her/his public benefits? | | | |
| **3. Other** | | | | |
| a. | Did the individual participate in at least one **vocational or situational assessment?** When? (Add date) | | | |
| b. | Did the individual complete at least one **trial work experience**? (Add date) | | | |
| c. | Did the individual receive outreach, education and support services? (Add dates if yes) | | | |
| d. | Is there indication whether the individual and his/her authorized representative or family member had opportunities to speak with persons currently working in integrated community jobs? | | | |
| e. | Has a Consent Decree Variance been requested by or for the individual? | | | |
| f. | Was the Consent Decree Variance approved? Date: | | | |
| g. | Does the person require physical adaptations or adaptive devices? | | | |
| h. | Does the person require communication aides or assistance? | | | |
| i. | Is the person receiving translation, interpretation and sign language services when needed? | | | |
| j. | If physical adaptations, communication aides or other assistance is needed is it being provided at work and/or in integrated day services? | | | |
| k. | Does the record include documentation that provider agency staff have received the training necessary to support the person in accordance with her or his plan? | | | |

Use NA if the question does not apply to the individual
Use UNK if the answer is not known or information is not available

**Observations and Interviews**

**Day Services.** Answers to these questions may be obtained through interviews with the individual receiving support, family members or support staff, or through direct observation. Please indicate the source of the information, such as consumer interview, family member, staff or direct observation.

Respondent (if applicable) _____

| Integrated Day Services | Yes | No or No Data | Note |
|---|---|---|---|
| 1. Were the integrated day services chosen or selected by the individual? | | | |
| 2. Are the services self-directed? | | | |
| 3. Does the person participate individually or in a group with other people with disabilities (specify in the Note section)? | | | |
| 4. If in a group, how many others are in the group and what is the staff to individual ratio? | | | |
| 5. Are day services provided as often as the person wants, during the times and on days of the person's choosing? | | | |
| 6. Are integrated day services individualized, flexible, purposeful and productive? | | | |
| 7. Do integrated day services provide opportunities to interact with individuals without disabilities in a community setting to the fullest extent practical for the individual? | | | |
| 8. Do integrated day services allow the individual to engage in non-work activities that match the person's interests, preferences, and goals? | | | |
| 9. Do integrated day services allow the person to participate at times, frequencies, and with persons of their choosing during the day, when not working, receiving residential support or educational services? | | | |
| 10. Are Integrated Day Services furnished as part of a sheltered workshop, day services, group home, or residential service provider's on-site program? | | | |
| 11. Do the Integrated Day Services include an adequate mix of leisure, employment- related, and daily life activities that are comparable to those activities engaged in by working-age non-disabled peers, | | | |
| 12. Do the integrated day services include the availability of paid and natural supports? | | | |

| | | | | |
|---|---|---|---|---|
| 13. | If the individual is of retirement-age does the person have access to supported retirement activities that are comparable to those engaged in by retirement-age non-disabled peers and include paid and natural supports? | | | |
| 14. | Did the individual make an informed choice to select an Integrated Day-Only Placement in lieu of a Supported Employment Placement. | | | |

15. **List the natural supports and/or community activities used by the person on a regular basis and whether each is identified in the ISP/IEP or individual record.**

16. **Transportation.** Does the individual receive the transportation services he or she needs to participate in community activities as often as he or she would like? (Yes/No)

17. **Was this person <u>observed</u> receiving supports in an integrated day service setting(s)?** (Yes/No)

18. **If yes, were the integrated supports:**

    a. Individualized, flexible, purposeful, and productive? (Yes/No)

    b. Selected and designed by the service recipient? (Yes/No) Through person-centered planning process? (Yes/No)

    c. Necessary and sufficient to allow the individual to participate in an array of group and non-group, structured and unstructured, activities? (Yes/No)

    d. Chosen by the individual from an array of group and non-group activities and structured and unstructured activities? (Yes/No).

19. **Interview questions (Examples)**

    a. What do you do during the day?

    b. Tell me about a good day in the community

    c.   What is a bad day like?

    d.   Who do you like to spend time with during the day?

    e.   Do the supports you receive help you do what you want to do?

    f.   What things do you like to do?

    g.   Do you have friends or family to help you make decisions?

    h.   Do you enjoy the community activities you're involved in?

    i.   Do you have friends that you spend time with in the community?

    j.   Would you like to do something different during the day?

20. Other interview questions asked:

**Summary Comments**

## ATTACHMENT II

**Summary of the status of person-centered career development plans for the 8 TTP Target Population members not served by CWS**

| Individual | CDP/ISP Plan Status (acceptability) | Issues or Problems | Needed Actions |
|---|---|---|---|
| MC | Partial | ISP and CDP both completed but due to reported medical leave and health concerns, needs updating | ISP due in December and the provider will be updating accordingly. |
| BF | Partial | ISP and CDP both completed and current but not well aligned | Provider and SCW advised of findings and directed to update and/or revise. |
| SM | Unacceptable | ISP and CDP both completed and current but not well aligned | ISP due in January, provider advised of findings for inclusion/correction in upcoming December ISP. |
| EM | Unacceptable | ISP and CDP both completed but due to reported medical leave and health concerns, needs updating | Just returned from medical leave, provider advised to update accordingly |
| NM | Partial | ISP and CDP both completed and current but not well aligned | ISP due in October and provider will be updating accordingly. |
| SP | Partial | CDP was not complete | Provider advised of findings for November ISP submission |
| SS | Unacceptable | ISP and CDP both completed and current but not well aligned | Provider advised of findings and directed to correct with upcoming submission of ISP |
| TH | Unacceptable | Needed new plan due to change in agency | ISP due in November and provider will be updating accordingly. |

**ATTACHMENT III**



**ACTION PLAN for IMPLEMENTING AN EMPLOYMENT WITHOUT WALLS PILOT**

**November 13, 2017**

> <u>*Note*</u>: **This report has been edited by the Court Monitor to replace references to the names of individuals receiving support from CWS with their initials. This process resulted in formatting errors in some areas.**

**I.     BACKGROUND AND OVERVIEW**

Over the past six months since the state formally accepted our plan to address program deficiencies, CWS-RI has been working diligently to build the foundation for a strong, successful and person-centered employment program.

We have adopted the following operational principles:
1.  Urgency, it's time to act;
2.  Ownership and collective accountability for participant employment and community engagement;
3.  Learn by doing – meaningful experiential activities are the norm;
4.  Lifelong learning – creating an environment for personal and professional development for all participants;
5.  Motivation through productivity – we celebrate every milestone moment in a participants journey toward employment and becoming as independent as possible.

CWS-RI holds its team members accountable for imparting and modeling, these principles and philosophy for our participants, at all times.

There are common expectations for all CWS-RI employees when they encounter challenging situations: they acknowledge it; own it; find solutions; and make it happen.

CWSRI is consistently improving its person-centered planning with our participants. We recognize the heart of these processes must focus on fully understanding the goals and dreams of each program participant—as it relates to both employment and daily living. As a result, we are revamping our ISP, CDP, and PATH processes. To date, we have completed PATHS for 100% of program participants. We are starting to update ISPs and Career Development Plans in a revised procedure described below.

ISP meetings occur annually and should occur no more than 365 days apart. On average, most ISP's will be conducted approximately 60 days before the anniversary date so that the plan can be revised and submitted to BHDDH 45 days before the anniversary date which is when the final plan is due.

- Approximately **90 days** before the ISP anniversary date, the Community Support Manager should schedule a pre-ISP meeting no later than **75 days** before the ISP

Community Advocate(s) to discuss his/her life vision and goals. Goals should be considered in the following four life areas as prescribed by the RI state ISP: Health, Safety, Social, and Employment. In some cases, the Community Support Manager may meet with parents or guardians to complete vision statements; however, whenever possible, it should be with the person who is the subject of the ISP. The participant's Career Development Plan (CDP) should also be reviewed to ensure complete alignment with the ISP, and new ideas for goals should be included.

- Once the pre-ISP meeting is complete, the Community Support Manager should complete all required assessments, progress summaries, and updates to plans as indicated on the ISP meeting check list and prepare all forms and consents requiring signature as indicated on the ISP meeting check list so that they can be approved and signatures obtained at the ISP. The ISP meeting with the full team consisting of the participant, their family/guardians, other pertinent people in their lives, Community Support Manager, Business Developer, Community Advocate(s), BHDDH Social Worker, and/or ORS Counselor should be scheduled to take place no later than **60 days** before the ISP anniversary date.

- During the ISP, the Community Support Manager will present the information obtained and prepared ahead of time to assist the team with the development of the upcoming year's goals. The Community Support Manager will record the information from the ISP meeting, assure the signature page is completed and signed by all those who are present at the ISP meeting (including the date), and obtain any signatures needed for the plan documents as indicated on the ISP checklist.

- The Community Support Manager will then work with the CWS-RI team to complete the Person-Centered Plan including updating the ISP packet, CDP, PATH and other documents requested by BHDDH. One goal implementation strategy should be completed for each goal within the plan. Once this packet is completed (assuring signatures and dates are in all pertinent areas), it should be submitted to the Business Manager for approval and creation of a new PO. This should be completed no later than **7 days** of the ISP meeting.

- Once submitted to the Business Manager, the PO will be created within **2 days** and given back to the Community Support Manager. The PO will then need to be signed and dated by the participant within **2 days** and returned to the Business Manager or Deputy Director for final approval.

- Once final approval is obtained, the Business Manager will scan the plan into the CWS-RI database and email the final plan to the respective BHDDH Social Worker with a CC to the Deputy Director. This will be sent *no later than* **45 days** before the ISP anniversary date.

- The new plan will then be returned to the Community Support Manager who will place a copy of the updated Person-Centered Plan into the participant's confidential file at the CWS-RI office.

- ISP goals/implementation strategies will go into effect after they are approved by the participant's team.  Training within the participant's team should occur upon implementation.

- Quarterly progress reports will be completed by CWS-RI staff. Six (6) month progress report must be

completed and submitted to BHDDH. A copy should be filed in the participant record at the CWSRI office.

**2 |** P a g e

- If the ISP does not occur, the Business Manager and Deputy Director should be notified. Follow-up should also occur with the Social Worker and documented.

- All correspondence regarding the ISP should be kept in an internal file by the CWS-RI Community Support Manager.

We have re-engaged a growing number of family members and are finding very promising responses to these efforts. Just this past week three family caregivers who had indicated that they did not want their loved ones to become employed (although the program participant expressed that they wanted to work) have changed their minds and are working with us to advance employment of the participant.

We have enhanced our daily activities provided to program participants, holding town hall forums and leveraging the learning from the PATH and ISP sessions where participants drive the identification of activities that best meet their interests and at the same time enhance their ability to become employed in a fully integrated setting. This is an ongoing learning process and will be enhanced further through the implementation of the pilot.

While we are not where we want to be—which is employment of every individual served—each week we are building new relationships with business, scheduling many job interviews for participants to develop their interview skills and placing people in both regular and customized jobs. **At the writing of this plan 54% of our 66 program participants are employed.** Of those, 59 are ISA Class Members and of those, 31 (or 52%) are employed. (NOTE the 59 ISA Class members does not include ten individuals whom are deceased or their cases are closed with CWS and they have moved to other agencies). (See further delineation of program participants in Section II Participant Status).

In an effort to move from even the perception of center-based programming, and based on conversations with BHDDH and the Department of Justice, and because of our commitment to building a state of the art, person-centered employment program, Lori Norris accompanied DOJ personnel on a site visit to a program in Maine (KFI) where they have successfully employed individuals with I/DD in a "wrap around" model. The program at KFI is founded on the concept that everyone can work, everyone can build community connections and everyone can live in some degree of autonomy with the right supports.

Following Lori Norris' visit to KFI, CWS leadership spent hours working to refine the KFI program model to work within the State of Rhode Island. Our new model, entitled ***Employment Services Without Walls*** is being piloted with seven individuals starting the 23rd of October, with the goal of full implementation starting in January/February of 2018. In this model, an assigned and integrated team of CWS staff are providing supportive services through flexible scheduling including evening and weekends to help participants:

**4 |** P a g

- Obtain fully integrated employment for those notemployed;
- Increase number of hours employed and continue to build their career ladder;and
- Develop strong ties to their community through involvement in communityefforts/activities, building friendships, and learning how to effectively use publictransportation.

While the individual is readying for employment we are leveraging information from participant PATHS and ISPs to engage each individual in integrated community activities that they drive that help

them build community connections, enhance independence and ready individuals for work. There are many ways we are actively seeking to learn what each participant enjoys and the kind of activities that give them satisfaction. Some of this involves simple conversation with them, and paying attention to what they talk about with others—what excites them, and engaging their families to learn what they love to do at home, and sometimes it is simply about exposing the individual to an activity that is new to them and paying close attention to their reaction. We are concurrently involved in each of these discovery activities.

In order to more fully implement *__Employment Services Without Walls__*, an additional job developer has been leveraged from other programs within our agency to identify employment opportunities for program participants reflecting their career interests/goals.  She will remain as part of the program and be integrated into the CWS-RI budget.


## II.      PARTICIPANT STATUS

As of November 10th, 2017, there are a total of 67 individuals receiving services at CWS RI—of those one receives respite services only. As such there are 66 individuals in integrated day services and of those 59 are ISA class members.   These individuals fall into the following categories:


1) **Employed:** 36 program participants (54%) are employed. One individual is completing a Community Based Work experience. Of the ISA members who are currently being served by CWS-RI (59) 31 or 52% are employed. Of those, 9 or 25% are underemployed and need additional hours at their job. We are working with each of these participants and their employer to increase employment hours.

   These individuals include:
   1.   M. A.  (ISA Class member)
   2.   P. A.  (ISA Class Member)
   3.   N. B.  (ISA Class Member)
   4.   C. C.  (ISA Class Member)
   5.   M. C.  (ISA Class Member)
   6.   O. D. (ISA Class Member)
   7.   L. D.  (ISA Class Member)
   8.   T. H. (ISA Class Member)
   9.   G. H. (ISA Class Member)
   10.  K. K.
   11.  C. M. (ISA Class Member)
   12.  E. M. (ISA Class Member)
   13.  P. M.  (ISA Class Member)
   14.  L. M. (ISA Class Member)
   15.  J. P. (ISA Class Member)
   16.  S. P. (ISA Class Member)
   17.  D. P.  (ISA Class Member)
   18.  J. R.  (ISA Class Member)
   19.  K. R.  (ISA Class Member)
   20.  I. S.   (ISA Class Member)

21. M. S.  (ISA Class Member)
22. J. S.
23. M.S.  (ISA Class Member)
24. J. U. (ISA Class Member)
25. N. O.
26. S. D.  (ISA Class Member)
27. B. N. (ISA Class member)
28. S. W.  (ISA Class Member)
29. A. M.
30. S. C.   (ISA Class Member)
31. G. K.
32. C. P. (ISA Class Member)
33. K. L. (ISA Class Member)
34. S. V.  (ISA Class Member)
35. S. K. ** (ISA Class Member)
36. F. B.   (ISA Class Member)

Of note is that of the individuals who are employed, we are making a concerted effort to increase in the number of hours worked. Since they obtained employment, the following participants increased their hours of employment, either within their current employment or by moving to new jobs.

· L. D. started working 20 hours per week at Eleanor Slater Hospital and now works 37.5 hours per week.
· T. H. started working 12 hours per week at Walmart and now works between 18-20 hours per week.
· C. M. started working at Automated Business Solutions at 9 hours per week and now works 25 hours per week.

We believe that the structure of the pilot and the integrated team approach will further this success, allowing us to focus our efforts in an integrated manner.

2) **Want to Work**: There are 18 additional program participants who express that they want to work. Of those, the majority have experienced significant work readiness training and we believe would be successful in employment setting. Some of these will need customized jobs and we continue to work with businesses to develop these positions. During the week of October 23rd, 7 individuals on the list below have viable job interviews (indicated by the ** asterisk) that we believe could result in job offers within the next several weeks.

**These individuals include:**

1. M. A. ** (ISA Class Member)
2. T. C. **
3. J. M. **  (ISA Class Member)
4. D. M. **  (ISA Class Member)
5. T. O. ** (ISA Class Member)

6.   R. W. **  (ISA Class Member)
7.   R.B.  (ISA Class Member)
8.   E. C.  (ISA Class Member)
9.   L. M.  (ISA Class Member)
10.  A. P. (ISA Class Member)
11.  S. T. (ISA Class Member)
12.  Y. S. (ISA Class Member)
13.  E. R.  (ISA Class Member)

14.  R. G. NOTE: Previously Mom had expressed that she did not want R to work due to her concern about benefits. During recent discussions between case manager and Mom the benefit issue was discussed and we were able to assuage her fears. We are also referring the family to benefits counseling. We also learned how concerned Mom was that R was vulnerable to being taken advantage of by a man. With Mom the team decided to assign a female job coach once R is employed to ensure her safety.
15.  J. D. NOTE: Previously Mom did not want J. employed due to her concern about loss of benefits. However during an ISP held on October 23rd, this issue was discussed at length and her concerns have been alleviated. We are referring J. and her family to benefits counseling.  (ISA Class Member)
16.  K. S. Note: K. regularly goes on trips outside of the country for months at a time and as of the writing of this report he is currently out of the country. We will need to think creatively, working with K. and his family in order for him to obtain and retain employment.   (ISA Class Member)

17.  D. S.  (ISA Class Member)
18.  F. O. Currently placed in a Community Based Work Experience. (ISA Class Member)

3)  **Questionable Program Involvement**: We have three program participants who have decided not to maintain their involvement in CWS RI. We continue to work through the transition of these individuals.

   1)  **D. J.** Following leaving employment at the Turnpike Authority on 9/22/17 D made the decision to stay with Refocus for her integrated day services. She was firm on this decision. We are currently in discussions with Refocus as we transition D's integrated day services to them. (ISA Class Member)

   2)  **J. H.** has not participated in services since August 2017. He came to the program for 3 days in August and prior to that he hadn't attended since early 2017. J and his mother decided (after various conversations) that he would no longer attend CWS-RI for any services. J's mother informed his case manager of this on October 18th. 2017. We told her that if, at any point in the future, J decides he would like to come back to us,  he will be more than welcome.  (ISA Class Member)

   3)  **M. D.** is a volunteer at the Providence Police Department. He has not completed a recent ISP and has not responded to our consistent outreach. We will continue to attempt to contact him and work with his DDD SCW to ensure that he no longer wants

integrated day activities.  (ISA Class Member)

4) **Retirement**: We have two individuals G. L. and P. F. who have indicated that they want to retire. We will continue to provide integrated day services for these individuals as they desire, taking advantage of Senior Centers and existing community resources, that already have an array of community services for senior citizens.  (Both are ISA Class Members)

5) **Choose Not to Work or Uncertain about Employment**: There are 7 individuals whom either they or their family members express significant concern about employment. Our program for them involves integrated day activities driven by their interests. As part of these activities we will work to engage each participant in learning/using public transportation if at all possible and appropriate and building community connections.  We will also continue to work with each person and their family, understanding that overcoming fears and objections about employment can take time and through person-centered planning we will continue to expand their opportunities and relationships through community integration. It is not our intent to transition any of our current program participants who want to stay with us. As part of our efforts we will refer to both RIPIN and Sherlock Center FEAT training.

Individuals who are currently uncertain about employment include:
1) A. D.  (ISA Class Member)
2) D. F. (ISA Class Member)
3) N. G.  (ISA Class Member)
4) R. R. (ISA Class Member)
5) R. D.  (ISA Class Member)
6) K. R.  (ISA Class Member)
7) L. F. (ISA Class Member)

Given the analysis above, of the 59 ISA class members we are serving, 5 individuals are transitioning to other agencies or have indicated that retirement is their goal. This means that we have 54 active ISA class members we are working to engage in employment, support/advance hours of current employment, and help them build strong connections to their own community. **Of the 54 active ISA class members, 31 or (57%) are employed**.

**II. ACTION STEPS, TIMEFRAME AND RESPONSIBLE PARTY FOR MOVING TO EMPLOYMENT SERVICES WTIHOUT WALLS**

Our detailed action plan to address each of the groups above through the implementation of our **Employment Services Without Walls** program model is outlined below.

In this model, an assigned team to include a Community Support Manager, Business Developer and at least two Community Advocates will provide supportive services to program participants through flexible scheduling including evening and weekends to help each participant accomplish the following:

- Obtain fully integrated employment for those not employed and provide job coaching as needed fading as appropriate;
- Increase number of hours employed and continue to build their career ladder; and/or

- Develop strong ties to their community through involvement in community efforts/activities,

building friendships, and learning how to effectively use public transportation.

This program model is designed so that over time, we will only provide services to participants within the community, taking person-centered planning to the next level by for the most part, eliminating reliance on a centralized facility and a daily set of "activities" available from 9-3. As often as is possible, the participants involved in the pilot will not report to the facility but will either go directly to their job **or a community based activity of their design and choosing** that is focused on helping build community connections and enhance work readiness, career laddering and ability to live as independently as possible.

This will occur at different stages for pilot participants. We are working closely with participants, family members and providers to gradually move in this direction. (See sample to the right).

A critical component of **Employment Services Without Walls** is the creativity and skill building that is required to ensure reliable and flexible transportation. Also, we are currently working with family caregivers and residential program providers to ensure that this approach will not negatively impact them.  Timelines for the pilot are listed in the chart on the following page.

When considering potential pilot candidates, we looked at the following criteria:

- The participant has expressed a strong desire to work but needs a team to support this employment and to support a reduced reliance on coming to the center.
- The participant is employed but expresses an interest in additional hours or a different kind of employment, and is able, with focused assistance to go directly to employment or community based services;
- The participant is newly employed and is able and interested in reducing reliance on coming to the center; or
- The participant is working but life circumstances may impact job retention and he/she needs additional support.

> When C. P. became employed she was thrilled about getting her first paycheck. She rapidly spent the money she earned. We started to talk to her about managing her money, establishing a savings account and she seemed interested.  We are slowly starting to integrate this into her daily activities as we help her develop life skills and increase her connection to the community.
>
> Following several weeks of employment, C started to talk about missing her friends from CWS- RI. We were concerned that this sense of loss could impact her success on the job. Her case manager is working on creating social experiences with C and one of C's closest friends at CWS-RI. They both enjoy arts and crafts. The case manager hopes to bring them together over the weekend so that they can go to a craft shop and then spend time making holiday gifts.

You will note in the plan below that at the end of November, and every month thereafter, we will evaluate the efficacy of the pilot through the following outcomes:

- Individuals have achieved both integrated employment and they are less reliant on coming to the facility;
- Individuals demonstrate an increased ability to use transportation to and from their jobs and community activities;
- There is an increase in the length of time program participants are staying in jobs (see chart below where retention rates of individuals currently employed are reflected);
- Individuals who expressed an interest in working more hours, are in fact working additional hours;

- Families and program participants express satisfaction in the services being provided.



**It is important to emphasize** that while we are building and testing this pilot, we will at the same time, continue to provide comprehensive services to **every program participant**—working to help them secure employment and participate in daily activities of their choosing (that they helped to identify and drive) that continue to develop their work readiness skills. For those who do not choose employment at this time, we will continue to work with them to create daily activities that they choose and that they help design and drive with the hope that in time they may be interested in exploring some form of employment.  **In no way does the pilot impact our efforts to continually enhance our programming and services for EVERY program participant**. While it is our plan to have 11 people active in the pilot by the end of November, it is also our goal to ensure that the remaining program participants continue to drive their involvement in meaningful integrated day services that are readying them for employment, are involved in job interviews, are placed in jobs, and are supported in their employment success.

**We are working hard with our business partners to ensure that every individual who has expressed an interest in working, is employed within the next 6 months**. For those who are currently indicating that they do not want to work, we are using every opportunity and community experience to expand their comfort level. We are also working with family members who do not want their loved ones to work, to understand their perspectives and slowly help them overcome their fears. Part of the person-centered nature of our practice is to accept program participants where they are at, and work with them to help them become increasingly comfortable with being part of an employment environment.

The charts on the following pages outline the specific activities we will engage in as we work to implement the **Employment Without Walls** pilot, current status, timeline for completion and individuals with CWS-RI who are responsible for the activity.

1. **Pilot Implementation**

| Activity | Status | Timeframe for Completion | Responsible Party |
|---|---|---|---|
| Identify program participants for launch the week of October 23rd.<br>1) S. D.<br>2) P. A.<br>3) C. C.<br>4) C. P.<br>5) F. B.<br>6) M. A.<br>7) J. P. | Completed | October 23rd | CWS Staff |
| Meet with family members/caregivers of each individual identified above, to describe the Employment Services Without Walls model, it goals and how it differs from current services. These meetings will be planned and facilitated by our case managers.<br><br>Some of these meetings will occur in the participant's home, some will be part of the ISP discussions and some will be phone calls (if no other in person meeting option is available).<br><br>We are aware that for some of the participants the caregivers are residential providers. By modifying our programming, we understand that this may impact residential care programming. We will work individually with each provider to structure the time and days of services so that they are in keeping with the ISP goals and at the same time do not place undue hardships on the residential providers. | Ongoing | December 15, 2017 | CWS Case managers |

| Activity | Status | Timeframe for Completion | Responsible Party |
|---|---|---|---|
| Modify current staff job descriptions to more accurately reflect the work to be accomplished within the Employment Services Without Walls model. | Completed | October 30th | Shawn McCurley |
| Provide training to staff on the Employment Services Without Walls program model. Training will include the following:<br><br>• Goals for *Employment Services Without Walls*<br>• What is Different, What is the Same<br>• Discussion of modifications in Job Descriptions<br>• How the team (Community Support Manager, Business Developer and Community Advocates) work as an integrated team to advance the employment goals and community connection goals of program participants<br>• Building a community of support for program participants including how to help participants build strong community connections<br>• Discovery and Best Practices in Customized Employment | In process<br><br>Two training sessions have occurred. | Will train new staff as they come on board. | Lori Norris and Shawn McCurley |

| Activities | Status | Timeframe for Completion | Responsible Party |
|---|---|---|---|
| | | | |
| Assign a team to support program participants in the pilot consisting of a Community Support Manager, Business Developer and at least two Community Advocates.

Staffing hours will align with the desired activities and supports by participants and will focus on employment, employment stability, career growth and building community connections. | In process | November 30, 2017 | Shawn McCurley and team |
| For those plans that are not reflective of employment goals or where there has been identified misalignment with the CDP, or if the ISP is over 6 months old, we are conducting a new ISP. | In process | December 15, 2017 | Shawn McCurley and Case Managers |
| Identify employment opportunities for each person within the pilot who is not employed, and assist the participant in the interview process, onboarding and job success. | In process 11 people have obtained employment since October 11 -of those 9 were ISA Class members | January 2018 | Job Developers |
| Meet with each program participant who is employed (and their caregiver) to determine the number of hours they can/want to work. The team will work with employers to expand hours and/or with program participant to determine other potential employment options where more hours are available. These discussions will include the impact of benefits, and referrals to benefits counseling for benefits planning, to ensure (any) impact is clearly understood by the participant and their family. | In process | January 15, 2018 | Community Support Managers and Job Developers |

| Activities | Status | Timeframe for Completion | Responsible Party |
|---|---|---|---|
| Creating an individualized schedule: Start the process by working with each pilot participant to plan their individualized schedule. (how to get to work or to community activity). This involves working with transportation supports.<br><br>Develop activities for each program participant that reflect their goals as outlined in the PATHS and ISP. If there is a need for the ISP to be modified based on these discussions, the case manager will work with BHDDH and other individuals involved in the life of the participant to schedule an ISP meeting.<br><br>These activities will occur on evenings and weekends and are specifically focused on building a community to which the program participant is closely connected. Work with family, friends and neighbors to help develop this community. Continue to expand activities, hours/days as in keeping with participant's goals. | Ongoing | January 2018 | Team to include Case Managers and Community Advocates |
| Modify Job Clubs to focus on individuals who are employed or where employment is imminent. Goal is to establish two per month.<br><br>The Job Club will serve as a supportive environment for individuals as well as an opportunity to maintain important connections to program participants. | In process | December 2017 | Business Developers |

| Activity | Status | Timeframe for Completion | Responsible Party |
|---|---|---|---|
| | | | |
| Identify program participants for the Phase II Pilot to be launched the week of January 15th 2018.<br>1)     M. A.<br>2)     J. M.<br>3)     T. C.<br>4)     G. H.<br>5)     A. M. (NOTE: We have already begun discussions with Opportunities Unlimited – A's residential care provider potential changes in her schedule, finding ways to make this process "doable" for A and for Work Opportunities. We are exploring the use of Uber as a strategy for helping A get back and forth to work and community activities.) | Completed | October 30th | Shawn McCurley and team |
| Begin discussions with family members/caregivers about above individual's involvement in pilot. | To be initiated | December 2017 | Joanne DelAngelo and Community Support Managers |
| Continue the same process of review of ISP and completion of new as determined appropriate, job identification, | In process | February 2018 | CWS staff |

| | | | |
|---|---|---|---|
| exploration of additional work hours and building of community connections for Phase II pilot participants. | | | |
| Evaluate the efficacy of the pilot in meeting the goals of expanded hours, employment, retention and family and participant satisfaction.<br><br>Identify lessons learned from the project and discuss any program modifications based on learning. | In process | Starting at the end of November and monthly review and modification as indicated thereafter. | Lorrie Lutz, Lori Norris and Shawn McCurley, Case Managers and Community Advocates |
| **Moving from Pilot to Full Implementation by April 2018** | | | |
| Teams consisting Community Support Manager, Business Developer and Community Advocate will be assigned to remaining program participants. | To Be Initiated | April 2018 Full Implementation | CWS Staff |
| All staffing hours will align with the desired activities and supports by participants and will focus on employment, employment stability, career growth and building community connections. | To Be Initiated | April 2018 | Shawn McCurley and CWS staff |
| The majority of services will be in the community including case coordination meetings, annual ISP's, etc. | To Be Initiated | April 2018 | Shawn McCurley and CWS staff |
| Continued program modification and on-going staff training to support new service model. | To be Initiated | Ongoing | Lorrie Lutz, Lori Norris, Shawn McCurley, Joanne DelAngelo and Abi Vega |

**2.Continue efforts to expand jobopportunities.**

**We currently have a total of 40 business partners** who are employing or working with us to employ program participants. We have engaged 13 new potential business partners including Rhode Island School of Design, Dave & Busters, Job Lot, Burlington Coat Factory, The GAP, Old Navy, Shanna's Restaurant, Whole Foods, Toys R Us, Walmart, Martin's Maintenance, Brewed Awakenings, and Central Falls Library.

Because we understand that many of our participants will need job carving and customized employment, our existing and emerging relationships with businesses are critical to our long-term success. We have found that it is through the continued building and nurturing of our business partnerships, being there when they need us, providing reliable and high quality onboarding and job coaching services, that we build trust. In time that trust results in their willingness to be innovative and to customize jobs for individuals who are able to manage several tasks in a work environment but may not be required to perform all the tasks of a position. Our business developers will be actively searching for very specific environments for customization for those in need of this type of employment.

| Activity | Timeframe | Responsible Party |
|---|---|---|
| Expand our business development activities to ensure that those who want to work have choices within diverse sectors. This requires that we reach out to new sectors and develop new options of interest to those we serve. We anticipate that many of these jobs will be within their identified career plan and it is also very likely that when a new job is presented, some may express significant interest—even though they had not previously considered it. We have recently expanded our sectors to include:<br>• Rhode Island Hospitality: Working with president of RIH; Streamline openings at hotels that work with RIH<br>• Providence Warwick Visitors Bureau: Established partnership with | October 2017 | Job Development Staff |

| Activity | Timeframe | Responsible Party |
|---|---|---|
| president of PWVB to advance hospitality openings.<br>• Retail sector (a much wider array of opportunities) | | |
| Approach two new or existing business partners each month in our efforts to develop customized employment opportunities for participants unable to manage all of the tasks of existing positions. | Starting in November and continuing each month | Job Developers |
| Continue to prepare individuals for work readiness through offering Get Ready! | October - November 2017 | CWS Staff |

Program participants have been introduced to our signature program -- Get Ready!™ www.getready- idd.fedcap.org which was developed to assist individuals in exploring their values about work, the strengths and assets they bring to the employment environment and to develop specific skills to ensure that they are work ready.  Get Ready! includes the following modules:

- o Learning About Yourself—exploring the participant's values about work
- o You Have the Solution! – discussing the strengths that the participant brings to the workplace around things like problem solving, timely, dedicated, etc.
- o Personal Branding –helping participants develop their "personal brand" and how they want to market themselves in interviews.
- o Career Exploration and Work Readiness – helping participants focus on the career choices that most align with their interests.
- o Building a Network of Support—exploring what it takes to build networks of relationships in the community.
- o Up the Ladder – helping to identify specific skills needed to obtain additional hours, get a raise or be promoted.

Each of the classroom discussions in Get Ready! are supported by experiential learning. So, for example, on October 19th a Connect2Careers™ session was held to introduce program participants to an array of career choices. Connect2Careers brought 28 business representatives together with 25 program participants in a speed dating like event. Program participants came prepared with business cards and resumes in hand—(that they developed while completing the Personal Branding module of Get Ready!) to conduct informational interviews and to learn about career options. This event was tremendously successful and inspired participants to pursue employment with enthusiasm.

3.  **While we are busy modifying our program mode, we continue to make an impact on the lives of individuals served.**

We continue to learn about the individuals that we serve, how to expand participant hours by strategic messaging to employers, how to help minimize parent's fears of having their loved one become employed, how to creatively design transportation, and how to create greater comfort in

spending time in the community.

We certainly don't always get it right.  It took us some time to understand that while L. F. loves Milton as his 1-1, and Milton is L's family's preference, he needs additional inspiration and exposure. As such, L is now accompanied by two staff, spending time in the pool
2-3 time per week, visiting the local the library, local parks, and he recently participated in the Connect 2 Careers event—things that heretofore Milton was uncomfortable undertaking. During the Connect2Career event L. came to the event with
business card and a resume. He visited 5 different
business representatives. (See photo). Recently we
met with the YMCA around L's involvement in their
programming.  Not only does L love to swim but we
observed his interest in a spin class. As a result of our
advocacy, the YMCA leadership agreed to order a
special bike that L can ride at the YMCA.



Here are some additional examples of how our
work is changing lives:

- Since entry into the CWS-RI program N.G. exhibited significant behavioral outbursts often thrusting himself upon the floor and throwing tantrums. Just a mere six months ago, N refused to leave the building and participate in any activity in the community. On the rare occasion he did go into the community, some sort of behavioral outburst would occur. Once we shifted to leaving the facility every day as CWS-RI moved to a community focused integrated day program, specific staff who N seemed to like were assigned to support him. Over time, N's reluctance to engage in the community started to diminish. N now goes into the community every day. He is willing to try different activities. He rarely has an outburst or even a behavioral issue.   We slowly introduced new staff to N and that too is working. N is starting to regularly smile, approach staff to engage and willing to have physical contact. We continue to work with N to create a higher level of comfort in being around people who are unfamiliar to him. We also work daily to help him find new ways to manage his frustration so that he has the potential to be more successful in an employment setting.

- S.D. has engaged in situational assessments and work experiences during her time at CWS-RI but had never been on the payroll of an employer. Most of the issues around employment arose during her interviews. She would become very frightened and not able to answer basic questions.  Through talking with S, and completing her PATH, we learned that she has a love of fashion, jewelry and crafts.  Over the past several months S worked hard to hone her interview skills, we conducted frequent mock interviews, group sessions using our Get Ready! Curriculum and one and one assistance. In time she developed her "personal brand" – learning to self market, and describe the value she would bring to a company. In the past three weeks S was able to successfully interview at Old Navy and is now a part-time sales associate.

- In 2014 K. K. was working in the workshop boxing items and wrapping pallets. K expressed an interest in having a job in the community and seemed to enjoy the physical aspects of warehouse work. The staff started searching for a job and found a seasonal opening in Lawn & Garden at Ann & Hope. K's job was to assist with loading Christmas trees into or on the customer's cars. K had initial coaching and was able to work independently through the season. After the season was over, Ann & Hope decided to keep K on as a very part- time worker in Lawn & Garden.  With additional coaching and support, K thoroughly learned the tasks of his job and the job coach was able to fade and once again Ann & Hope increased his hours.

In the past three years K has proven himself to be a very reliable and steady employee. He currently works four days a week, year-round. K loves his job and will be celebrating three years of employment in December!