Monitor Report
Status of Capacity to Meet Requirements of Consent Decree
Compliance with Court Orders – January 6, 2021; March 16, 2021; April 28, 2021
May 31, 2021

This report has two purposes – (1) to evaluate the capacity of the State to substantially meet the requirements of the Consent Decree and (2) to evaluate the extent to which the State has complied with the Court Orders of January 6, 2021; March 16, 2021; April 28, 2021.

**Capacity to Meet the Requirements of the Consent Decree**

The Court wants to remind the State that in 2014 the State of Rhode Island agreed with the United States Department of Justice that the civil rights of adolescents and adults with Intellectual and Developmental Disabilities had been violated. The State further agreed to a Consent Decree that was intended to remedy those civil rights violations. Thus, **this population continues to be a priority**.

Section IV of the Consent Decree sets benchmarks and a schedule for the number of individuals who are to receive a supported employment placement. Section V(K) of the Consent Decree states that, individuals in a supported employment placement "shall average, as determined by a point in time survey, work in an integrated employment setting for at least 20 hours per week". Per the State's March 31, 2021 Consent Decree Report, only 52% of the benchmark for the sheltered workshop target population had been met and only 79.4% of the benchmark for the day program population had been met. The average hours worked, per the State's report, is 9.8 hours. The Sherlock Employment and Day Activities Survey (the point-in-time survey collected in October, 2020) found that only 271 individuals who are members of the Consent Decree populations were employed in individual employer-paid employment. Another 6 were self-employed and 104 were employed in provider-paid individual or group employment.

Similarly, Section VI(B) of the Consent Decree states that "Integrated Day Services will be provided to all individuals in the…Target Populations who receive a Supported Employment Placement, for the remainder of all time set forth in an individual's ISP in a 40-hour work week in which such individuals are not in school or supported employment." The Sherlock Employment and Day Activities Survey documents that only 55% of the Consent Decree adult populations were participating in integrated community activities for an average of 9.48 hours per week. The Sherlock Survey further documents that only a small fraction of the Consent Decree populations are participating in combined integrated employment and community activities for more than 20 hours per week. These numbers are well below the benchmarks set in the Consent Decree.

Further, the report by the Approach Group included in the April 27, 2021 Court Hearing documented the percent of individuals who have experienced a decrease in "day services" (i.e., employment and community activity, as required by Sections IV, V, VI of the Consent Decree) between Quarter 4, 2019 and Quarter 4, 2020. This data is based on analysis of the "day support service units" provided to individuals. Individuals living with families experienced a 71.6% decrease, individuals in shared living a 57.1% decrease and individuals living independently a

49% decrease.  The primary reason cited by individuals and families who self-direct and by provider organizations is the shortage of direct support staff.  The document attached to the March 16, 2021 Court Order summarizes the challenges in recruiting and retaining staff, the turnover and vacancy rates experienced both by individuals who self-direct and by providers, and the connection between salary and staff recruitment and retention.

**Thus, at the current time, per the data summarized above, the State is not in compliance with Section IV, Section V(K) and Section VI(B) of the Consent Decree.**

The critical question is WHY.  Acknowledging the impact of COVID, the answer is deeper and broader than COVID.

The benchmarks outlined in Sections IV through VIII of the Consent Decree describe a model for services and supports that is significantly different than the model for providing services and that was in place prior to the Consent Decree.  Section V describes an array of supported employment services and supports, Section VI describes integrated community services and supports, Section VII focuses on individualized planning, Section VIII focuses on elements of quality transition that will lead to employment and community activity in integrated settings.  Taken together, these sections define the core components and benchmarks of systems innovation and transformation.

Sections IX through XIV of the Consent Decree essentially describe the strategies that must be undertaken by the State to substantially comply with the benchmarks established in Sections IV through VIII.

Section XI of the Consent Decree states that "…the State will ensure that it supports and maintains a sufficient capacity to deliver Supported Employment and Integrated Day Services…"  The reference to "maintains" indicates the need to develop a long term solution; thus, there is an emphasis by the Court on strategies that go beyond one year.   As documented at the April 27, 2021 hearing, there is currently not sufficient capacity to meet the requirements of the Consent Decree.  The evidence presented at that hearing documents that there is a service gap of more than 1000 direct support staff.  The decrease in services documented above is the result of this capacity gap.  If there is not sufficient capacity, there will not be substantial compliance with the Consent Decree.

Similarly, Section IX(3) of the Consent Decree states that "The State will ensure that all persons involved in the discovery and assessment process, the preparation and implementation of career development plans, and the provision of Supported Employment and Integrated Day Services and Placements for members of the Target Populations receive training specific to providing services and supports to individuals with I/DD."  Although there are several training programs (approved early in the Consent Decree term) that offer quality training, the systems transformation to an individualized community-based system required by the Consent Decree requires not only additional staff, but also revised training programs that reflect the changed responsibilities of direct support staff.  Again, the April 27, 2021 hearing documented a capacity gap of more than 1000 direct support staff and the need for additional competency-based training.  **There is currently not sufficient capacity to fully meet the requirements of the**

**Consent Decree; therefore, the State is currently not in compliance with Section IX(3) of the Consent Decree.**

Section XIV of Consent Decree states "The State shall timely fund the services and supports necessary to comply with this Consent Decree for the eligible members of the Rhode Island Sheltered Workshop, Rhode Island Day, Rhode Island Youth Transition, and Rhode Island Youth Exit Target Populations according to the standards and timelines set forth in this Consent Decree."  The question is whether there is sufficient funding to implement the requirements of the Consent Decree.  The intent of the Court was to define the parameters to be included in a multi-year plan and to encourage all branches of government to actively engage with individuals who have intellectual and developmental disabilities, families, advocates and service providers in developing that plan.  There has been such engagement with some aspects of planning, but not with all.

**In summary, the strategies needed to achieve substantial compliance by 2024 are centered on two categories – (1) transformation of systemic models for providing services and supports and (1) supporting and maintaining sufficient capacity.**

**At the current time, the State is not in compliance with Section XI and Section IX(3) of the Consent Decree….and has not adequately developed a multi-year plan that "…supports and maintains a sufficient capacity to deliver Supported Employment and Integrated Day Services…"**

These issues will prevent the State from achieving compliance with the outcomes and benchmarks defined in Sections IV through VIII of the Consent Decree by 2024.

**Compliance with Court Orders**

The January 6, March 16 and April 28, 2021 court orders were intended to address these issues.

Compliance with these Court Orders (*Note – connections to sections of the Consent Decree, specific language from Court Orders and dates are referenced below*):

Item 1 – Workforce
*This item is directly connected to capacity (Section XI) and funding (Section XIV)*
- Provide annual increases for DSP to reach $20 by FY24 (1/6/2021);
- Address the problem of low compensation and high turnover that prevents maintaining a stable and competitive workforce and sufficient Provider capacity (3/16/2021);
- At a minimum, the State must set DSP rates for FY22 at a rate comparable to rates paid in Massachusetts, Connecticut and the starting rate for RICLAS (3/28/2021).

Compliance Status: Partial Compliance for FY2022.  Providers accepted an increase to average rate of $15.75 for FY2022.  Providers expressed concern that this may be insufficient to address the capacity gap.  Letter from the State and response from Providers is attached.  No discussion has occurred for FY2023 and 2024.

Recommendation:  State and Providers continue to meet weekly until (a) agreement for process for comprehensive rate review has been reached, (b) rate increases for direct support staff and

supervisors for FY2023 and FY2024 have been agreed upon, (c) comprehensive rate review is complete. Bi-monthly joint report to the Court from State and Providers beginning July, 2021.

Item 2 – Three-Year Budget Strategy
*This item is directly connected to capacity (Section XI) and funding (Section XIV)*

- State will develop a three-year budget strategy that addresses the budget assumptions and issues detailed in the Court Monitor's Fiscal Analysis (1/6/2021);
- Continue to develop a three-year budget strategy…..Court requires that the three-year budget plan be mutually agreed to by both the State and the Providers (3/16,2021);
- Continue negotiations in preparation for FY23 and FY24 (4/28/2021).

Compliance Status: **Insufficient Discussion**. As indicated, Providers have accepted an increase to $15.75 for FY2022. During budget presentations to the Monitor and Providers during January-March, 2021 State outlined comprehensive model and rate review would be completed during FY2022. In response to Monitor's queries the State indicated this review could not be fully implemented until FY2024.

Recommendation: Review should be sufficiently completed in time to impact the Governor's budget request in March, 2022, as indicated by the State in their January-March budget presentations. State and Providers continue to meet weekly until (a) agreement for process for comprehensive rate review has been reached, (b) rate increases for direct support staff and supervisors for FY2023 and FY2024 have been agreed upon, (c) comprehensive rate review is complete. Bi-monthly joint report to the Court from State and Providers beginning July, 2021.

Item 3 – Provide proportional increases for other support staff (1/6/2021).
*This item is directly connected to capacity (Section XI) and funding (Section XIV)*

Compliance Status: Partial Compliance. State and Providers have agreed on an increase to $21.99 for supervisory staff for FY2022. There was no discussion of FY23 and FY24.

Recommendation: Similar increases for supervisory staff need to be included in budget plan for FY2023 and FY2024.

Item 4 – Comprehensive Plan Development
*This item is connected to Section VII and Sections IX through XIV with focus on "supporting and maintaining capacity.*
- Provide increased funding for comprehensive plan development aligned with individual budgets (1/6/2021);
- Development of individual service plans and individualized budgets (3/16/2021).

Compliance Status: Partial compliance. Planning for development of comprehensive individual plans and individual budgets is included in several working documents – (a) the work of the Quality Assurance Committee re: Conflict Free Case Management, (b) the administrative work groups and others. There is acknowledgement of the need for increased funding for this, but the Monitor has not seen any final recommendations re: budget.

Recommendation: State needs to develop a plan for increasing access to independent plan development, individualized budget development and case management. State needs to develop a rate for these services that adequately addresses the amount of time needed to qualitatively provide these supports. Report on process and rates to Court by September 30, 2021.

Item 5 – Transportation
*This item is a component of the process of transforming current models for providing services and supports to an individualized, community-based system.*
- Provide increased funding for transportation (1/6/2021);
- Adequate transportation (3/16/2021).

Compliance Status: Partial compliance. In State's response to Monitor's questions (dated May 27, 2021) there were descriptions of activities currently underway to address transportation. There were no budget numbers.

Recommendation: State should complete an assessment of the transportation needs of adults with IDD. State should sample a minimum of 25% of the population to determine need for transportation that will increase each person's access to employment and integrated community activities. State should develop and explain to individuals the available options and how to access these options. State should determine accurate costs and, if needed, increase transportation funding in individual budgets for the second half of FY2022. State should report to the Court on September 30, 2021 and December 31, 2021.

Item 6 – Technology
*This item is a component of the process of transforming current models for providing services and supports to an individualized, community-based system. There is a growing research base that documents the efficacy of technology as a support strategy, particularly in the context of staff shortages.*
- Provide a per capita amount for acquisition of technology (1/6/2021);
- Technology acquisition (3/16/2021).

Compliance Status: Partial compliance. In State's response to Monitor's questions (dated May 27, 2021) there were descriptions of activities currently underway to address acquisition and use of technology as support. There were no budget numbers. There was no reference to any plan for establishing a per capita amount (above current tier levels) for acquisition and use of technology.

Recommendation: The State should develop a user-friendly guide to accessing and using technology as a support. As indicated in the original order, as a strategy for promoting the use of technology as support, the State should develop a targeted per-capita funding stream by December 31, 2021. State should report to the Court on September 30, 2021 and December 31, 2021.

Item 7 – Developing/Implementing a Community-Based System

*This item is a component of the process of transforming current models for providing services and supports to an individualized, community-based system and is strongly rooted in Sections IV through VIII of the Consent Decree.*
- Provide funding to address the cost of transitioning Developmental Disabilities supports to an individualized community-based model (1/6/2021);
- Alignment funding and reimbursement model with development of a community-based system…ensure payment models align with Medicaid standards (3/16/2021).

Compliance Status: **Not in compliance**.  The need for identifying and supporting the additional costs associated with transitioning the system to an individualized community-based model has been widely acknowledged and discussed.  In developing the direct support and supervisory staff proposals highlighted earlier, **the State withdrew all transition and innovation funding**.  In the State's response to the Monitor's questions there were references to potential inclusion of innovation funds in the FY2023 budget request and references to considering the IDD population in the State's plan to use HCBS funding (as included in the American Relief Act guidance).  However, there were no firm commitments made for FY 2022 or beyond.

Recommendation:  Given that there are less than three years remaining in the Consent Decree, it is critical that the State provide transformation and innovation funds in FY2022.  The Court understands the prescribed public engagement process prior to developing a plan for following HCBS guidance.  State will report to the Court the extent of input from the IDD community (i.e., number of responses, types of requests, etc.) by June 10.  The State will develop a transition/innovation fund by September 30, 2021 and distribute said funds by December 31, 2021.  In addition to the June 10 report, the State should report to the Court on September 30, 2021 and December 31, 2021.

Item 8 – Identify other public and private funding sources that can be used to supplement the current system (1/6/2021).
*This item is connected to Section XIV and will assist individuals/families/providers in broadening the community activity of adults with IDD.*

Compliance Status:  Partial compliance.   Efforts are underway to identify supplemental funding.

Recommendation:  State should develop a guide for providers, individuals, families re: other sources of supplemental services, supports and funding including how to access these sources by December 31, 2021.

Item 9 – Caseload Estimating
*This item is directly connected to capacity (Section XI) and funding (Section XIV)*
- Beginning in 2021 include the DD population in semi-annual caseload estimating conferences (1/6/2021);
- Include IDD population in caseload estimating budget discussions for FY22 supplemental budget in November, 2021 (4/28/2021);
- Consistent data collection and reporting requirements to facilitate proper forecasting of costs, including strategies such as including the Developmental Disability population in the semi-annual caseload estimating conferences (3/16/2021).

Compliance Status: Partial Compliance. In the State's response to Monitor's questions (May 27) the process for including the IDD population in the November, 2021 caseload estimating conference. However, the State notes that doing so is contingent upon legislative approval.

Recommendation: The Court reminds the State this this was a court order, not a "request". State should expeditiously implement any steps needed to ensure inclusion of the IDD population by November, 2021.

Item 10 – Evaluation of Impact
- Evaluate impact on turnover/vacancy rates for both providers and individuals who self-direct (4/28/2021);
- Evaluate impact on number/percent of individuals with IDD who participate in employment and community activities in integrated settings (4/28/2021).

Compliance Status: To be developed.

Recommendation: Monitor will develop a set of metrics to measure the impact of fiscal and administrative actions on both workforce issues and access to employment and integrated community activity. Monitor will collect these data independently, directly from all Provider organizations and a sample of individuals who self-direct. Baseline data will be collected in July, 2021 and repeated quarterly. These data will be the trigger for the State and Providers to review the impact of rate and administrative revisions….and to determine if they are adequate. State and Providers will jointly report to the Court thirty days after each data collection has been completed.

Item 11 – By June 30, 2021the State will complete the revision of all aspects of the Developmental Disabilities funding and reimbursement system.
*This item is connected to Section XIV and Section X (Outreach, Education, Support) and to the July, 2021 order re: administrative barriers.*

Compliance Status: Substantial Compliance.
Monitor has reviewed the final recommendations (developed jointly with stakeholders) and draft action plan.

Recommendation: Finalize schedule for action plan. All administrative revisions will be implemented during FY2022.

Item 12 - Other Issues Pertinent to Individuals who Self-Direct.
*This item is connected to Sections IV through IX, Section XI and Section XIV*

Compliance Status: Partial Compliance. Negotiating sessions were conducted between the State and adults/families who self-direct and one fiscal intermediary. Rate increases will be applied to self-direct tier and budget packages. A self-direct administrative work group will be developed to address infrastructure and funding issues pertinent to self-direction.

Recommendation: State will meet with self-direct administrative workgroup on a bi-monthly basis beginning July, 2021. State will report recommendations and timelines to the Court quarterly beginning September 30, 2021.